Huntingdon, Inc. and Ryland Homes, Inc., Petitioners *v.* Pennsylvania Public Utility Commission, Respondent. Newtown Artesian Water Company, Intervenor.

Argued April 6, 1983, before Judges WILLIAMS, JR., DOYLE and BARBIERI, sitting as a panel of three.

*Richard P. McBride,* with him *Herbert K. Sudfeld, Jr., McBride, Murphy & Sudfeld,* for petitioners.

*Velma A. Boozer,* with her *Robert P. Meehan,* Assistant Counsel, *Louise Russell Knight,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Brenden E. Brett,* with him *D. Mark Thomas, Thomas & Thomas,* for intervenor.

OPINION BY JUDGE DOYLE, August 17, 1983:

Huntingdon, Inc. and Ryland Homes, Inc. appeal an order of the Pennsylvania Public Utility Commission (PUC) which directed it to pay a sum in the amount of $138,624.00 to the Newtown Artesian Water Company (Newtown) or suffer termination of water service to Huntingdon's residential development.

Huntingdon, Inc. (Huntingdon) is the developer of a seventy-nine acre residential development in Bucks County known as Sturbridge.[1] Prior to the start of construction on the site, Huntingdon approached Newtown to secure water service for the proposed development. Newtown, in a letter dated July 18, 1977, indicated an estimated figure of $76,470.00 to provide for off-site water storage and booster pumping capacity needed to extend service to Sturbridge. On September 30, 1977, Huntingdon filed a complaint before the PUC disputing the $76,470.00 sum for off-site capital contribution as a condition precedent to the provision of water service to the development. On May 2, 1978, Huntingdon and Newtown entered into an extension deposit agreement with an attached preliminary memorandum delineating estimated charges for

---

[1] Ryland Homes, Inc. is a builder which had purchased lots from Huntingdon for the construction and sale of single family homes.

the extension of service to the development. Included in the total was the sum of $76,470.00 for other estimated off-site costs.[2] Huntingdon executed the agreement but deposited $76,470.00 less than the total estimated in the memorandum. On October 10, 1978, at the request of Huntingdon, the complaint before the PUC was discontinued without prejudice.

Huntingdon proceeded with the development of Sturbridge, installing water distribution lines, main extensions and facilities within the development which were connected to an existing ten inch water main owned by Newtown which lies beneath the roadway of Route 413 abutting the development. As of February 27, 1981, approximately sixty single family homes had been constructed, sold and occupied in Sturbridge and had been provided water service by Newtown. On or about that date Newtown refused to provide further service to the remaining lots[3] in the development until Huntingdon made payment of $138,624.00 claimed to be due as a contribution for off-site improvements made *on behalf of Newtown* in providing water service to Sturbridge. Proceedings were then instituted before the PUC which resulted in the appeal now before this Court.[4] The factual genesis of the problem here presented follows:

---

[2] This figure included an estimated $17,800.00 for water storage, $8,900.00 for booster pumping and $49,770.00 for water source development. For a discussion of how these figures were generated, *see* text following note 10, *infra*.

[3] Huntingdon proposed to develop 152 homes in Sturbridge. Newtown did not terminate service to the homes already occupied. On February 27, 1981, the date service to the remaining lots was terminated, Huntington conveyed a house and lot to Eric and Mary Elizabeth Peterson. The Petersons were originally parties to the complaint before the PUC. Service has since been provided to the Peterson home and they are not parties to this appeal.

[4] Huntingdon filed a formal complaint before the PUC on March 6, 1981. Simultaneously, Huntingdon filed a Petition for

Prior to 1978, Newtown was serving between 1,000 and 1,500 customers and operating four wells and one storage tank with a capacity of 650,000 gallons. In 1973 or 1974, Huntingdon was only one among eight or nine developers requesting water supply from Newtown. In 1976, in response to the growth pressures represented by the requests of the developers, Newtown, pursuant to an agreement with eight developers, not including Huntingdon, formed a wholly owned subsidiary, Indian Rock Water Company (Indian Rock) for the construction of additional water storage and supply facilities.

The signatories to the agreement with Newtown contributed $2,414,948.48 in aid of the construction of off-site facilities which included a one million gallon storage tank. The Indian Rock facilities are integrated with the Newtown system and the capacity of the Indian Rock facilities is in excess of that needed to service the 2,643 residential units planned by the eight contributing developers. Newtown demands $138,624.00 as Huntingdon's share of the construction costs for the Indian Rock facilities.

---

Emergency Relief seeking restoration of water service pending a decision on the merits. By order entered March 16, 1981 the PUC granted the requested emergency relief and directed an expedited hearing on the merits. An initial hearing on the complaint was held on April 3, 1981 before Administrative Law Judge F. Ross CRUMLISH who issued his decision in favor of Newtown on June 19, 1981. On August 10, 1981, A.L.J. CRUMLISH denied Huntingdon's exceptions and on September 9, 1981, Huntingdon appealed to the PUC. On October 9, 1981, the PUC remanded for findings on two specific issues. A limited hearing was held on November 30, 1981 before Administrative Law Judge MORRIS MINDLIN who issued his decision on the two specific issues on December 23, 1981. On January 18, 1982 Huntingdon appealed A.L.J. MINDLIN's decision to the PUC. On January 22, 1982 the PUC adopted the initial decision of A.L.J. CRUMLISH and on January 29, 1982 entered the order which is appealed here.

Our review of PUC decisions is to determine whether constitutional rights were violated, an error of law was committed or whether the findings, determinations or orders of the Commission were supported by substantial evidence. *Fairview Water Co. v. Pennsylvania Public Utility Commission,* 55 Pa. Commonwealth Ct. 96, 422 A.2d 1209 (1980) ; *Manufacturers' Association of Erie v. Pennsylvania Public Utility Commission,* 47 Pa. Commonwealth Ct. 31, 407 A.2d 114 (1979). Before this Court, Huntingdon argues that PUC's determination that Newtown may require a contribution toward the cost of the Indian Rock facilities as a condition precedent to the provision of water service constitutes an error of law. Huntingdon also argues that the determination as to the amount of the contribution is not supported by substantial evidence.

The general rule that a utility must bear the cost of repairs and improvements is settled and is based upon the statutory requirement that the utility provide reasonable and adequate service.[5] *Fairview; McCormick v. Pennsylvania Public Utility Commission,* 48 Pa. Commonwealth Ct. 384, 409 A.2d 962 (1980) ; *see also, Colonial Products Co. v. Pennsylvania Public Utility Commission,* 188 Pa. Superior Ct. 163, 146 A.2d 657 (1958). In special circumstances, however, participation by the customers may reason-

---

[5] The general rule is rooted in the provisions of Section 1501 of the Public Utility Code, 66 Pa. C. S. §1501. Section 1501 provides, in pertinent part :

Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public.

ably be expected. *Fairview; McCormick.* The PUC may require participation in construction costs "where 'without the contribution or loan of the customers, the cost of construction would materially handicap the utility in securing a fair return on all its operations' or where the consuming public would be unduly burdened by the full cost being borne by the utility." *Fairview*, 55 Pa. Commonwealth Ct. at 99, 422 A.2d at 1211 (quoting *Ridley Township v. Pennsylvania Public Utility Commission*, 172 Pa. Superior Ct. 472, 479, 94 A.2d 168, 171 (1953)).

There is little question that Newtown's existing customers would have been unduly burdened had the utility borne the full cost of upgrading its water supply and storage facilities to meet the demand represented in the development plans of Huntingdon and the eight developers involved in the creation of Indian Rock.[6] And we do not accept Huntingdon's argu-

---

[6] In its brief to this Court, the PUC urges that Huntingdon, as the party seeking relief from discontinuance of its service, bore the burden, under Section 332(a) of the Public Utility Code (Code), 66 Pa. C. S. §332(a), to prove that the charges sought by Newtown were unjustified. The PUC characterized Huntingdon's complaint as a challenge to an "over-charge" and directs our attention to *Burleson v. Pennsylvania Public Utility Commission*, 66 Pa. Commonwealth Ct. 282, 443 A.2d 1373 (1982), *aff'd* ___ Pa. ___, 461 A.2d 1234 (No. 46 W.D. Appeal Dkt. 1982, filed July 11, 1983) and *Philadelphia Suburban Water Co. v. Feinstein*, 34 Pa. Commonwealth Ct. 516, 383 A.2d 997 (1978) to support its position that Huntingdon bore the burden of proof. Notwithstanding the fact that the complaint to the PUC was prompted by a discontinuance of service under 66 Pa. C. S. §1503, we believe the circumstances here are not analogous to the alleged "over-charge" due to a defective electrical cable in *Burleson* or to the "over-charge" because of a defective water meter in *Feinstein*. The charges asserted by the utility company here are more akin to costs asserted in ratemaking under Chapter 13 of the Code, 66 Pa. C. S. §§1301-1315. Consequently, we believe the utility should bear the burden to show the inadequacy of existing facilities and to justify the capital charges imposed as a condition to the receipt of service.

ment that the existing capacity of Newtown's system was not threatened by the development of Sturbridge or that Sturbridge did not contribute to the need for the Indian Rock facilities. Huntingdon was one of several developers seeking service from Newtown during approximately the same period in 1973 and 1974. While no single development may have necessitated the construction of the new facilities, together the proposed developments represented a growth in demand beyond the capacity of the existing Newtown system. For this reason, it is of no import that Newtown actually began supplying water service to Sturbridge before the Indian Rock facilities were completed and integrated with the Newtown system. The development of Sturbridge contributed significantly to the need for the Indian Rock facilities and Huntingdon, therefore, could reasonably be expected to participate in the financing of the new facilities.[7] Subject to the provisions of Section 1503 of the Public Utility Code, 66 Pa. C. S. §1503, Newtown could therefore discontinue service to Huntingdon for refusal to contribute as anticipated.

The opinion of Administrative Law Judge CRUMLISH, adopted by the PUC, does not appear to misapply the burden of proof, however, and the record amply supports his conclusion that the capacity of the Newtown system was inadequate to meet the development pressures to which Huntingdon contributed. The PUC's argument as to burden of proof is therefore of no import and we will not discuss it further.

[7] Huntingdon's express refusal to participate in the Indian Rock project and Newtown's subsequent provision of service is not significant. Service was provided under an extension deposit agreement, signed by Huntingdon, which expressly included off-site construction costs. Notwithstanding the fact that Huntingdon excluded the off-site construction monies from its deposit, we believe the execution of the deposit agreement by Huntingdon implied recognition that the development of Sturbridge would contribute to the need for additional facilities in the Newtown System.

The calculation of the $138,624.00 allegedly due, however, seems to be grossly in error and is not supported by substantial evidence. The figure is supposedly generated by dividing the $2,417,948.48 contribution by the eight developer/signatories to the Indian Rock agreement by the 2,643 units proposed by those developers, to yield a unit share of cost of $912.00. This unit share of cost was then multiplied by 152, the number of units proposed by Huntingdon, to yield $138,624.00. We note first that the arithmetic is wrong. $2,417,948.48 divided by 2,643 units yields a unit share of cost of $914.85. But the arithmetical error is not significant because the method of calculation is also incorrect.

Newtown and the PUC point out that the Indian Rock facilities have a capacity approximately twice that which is needed to service the developments of the eight signatory developers.[8] They urge that it would not be reasonable or fair to allow other developers served by the excess capacity, like Huntingdon, to enjoy a "free ride" at the expense of the eight signatories. That is, it would not be fair for subsequent developers to be able to develop less expensively because the eight have constructed a system greater than their needs. The unit share of cost calculation was designed to prevent such a "free ride" and recoup for the eight investors the cost of creating the excess capacity. Palpably, the calculation does much more. If the 2,643 units of the eight developers demand only half the capacity of the facilities then another 2,643 units could theoretically be constructed by other developers before capacity would be exceeded by demand. Assessment of these subsequent developers at a new unit

---

[8] The record indicates that facilities in excess of the capacity needed for the eight developers were constructed because numerous economies of scale were favorable.

share of cost generated by dividing total cost ($2,417,-948.46) by 2,643 would obviously yield contributions from the subsequent developers totalling $2,417,-948.46,[9] so that by the time the capacity of the facilities is reached the eight developers will have recouped *all* of their original contributions. This would have the effect of allowing the eight original developers to enjoy a ''free ride'' at the expense of the subsequent developers. The formula therefore cannot be correct.

In addition, there is nothing in the record to support the formula or even assessment of construction costs on a unit share basis. The Water Facilities Agreement, which provides for payment to the eight signatories of monies collected by subsequent developers for use of the excess capacities of the Indian Rock facilities, specifies that

> the amount of such payment shall be calculated
> by multiplying the total cost of project facilities
> by a ratio of the capacity (in gallons) used by
> the customer over the total capacity of the
> project facilities (in gallons).

The record indicates that Sturbridge requires 35,600 gallons of storage capacity; the capacity of the Indian Rock facilities is 1,000,000 gallons. Applying the formula, Huntingdon's share of the cost of the Indian Rock facilities would be 3.56% of the total. A similar formula is indicated in the preliminary memorandum attached to the extension deposit agreement between Huntingdon and Newtown.[10] That document broke down the off-site capital cost by multiplying the esti-

---

[9] $2,417,948.46 divided by 2,643 original units equals approximately $914.85. $914.85 multiplied by 2,643 additional new units equals $2,417,948.55.

[10] The information is contained in the letter dated July 18, 1977 from Newtown to Huntingdon. The letter is, by reference, incorporated into the preliminary memorandum attached to the extension deposit agreement.

mated cost of storage and booster pump facilities (with a projected one million gallon capacity) by a ratio of the projected use of Huntingdon (35,600 gallons) over the projected one million gallon capacity of the facilities. This also results in a 3.56% share.

Because Huntingdon was not a signatory to the Indian Rock Water Facilities Agreement, it is, of course, not subject to any formula found therein. Huntingdon did, however, execute the extension deposit agreement with Newtown. Although we recognize that Huntingdon never deposited the sum estimated for off-site capital costs and disputed the assessment of off-site construction costs before the PUC, we note that the proceedings before the PUC were discontinued at Huntingdon's request, and in any event the method of computing the off-site construction costs delineated in the preliminary memorandum was not disputed in those proceedings. In addition, Huntingdon concedes by argument in its brief that if any contribution to the construction costs of the Indian Rock facilities is due, it should be calculated according to the formula in the extension deposit agreement.

Accordingly, Huntingdon's share of the cost of the one million gallon Indian Rock storage tank should be 3.56% of the total cost of that component of the project. Similarly, Huntingdon should bear 3.56% of the cost of any pumping or water source facilities constructed as part of the Indian Rock project and serving the Newtown/Indian Rock integrated system, subject to the terms of the extension deposit agreement.

ORDER

Now, August 17, 1983, the order of the Pennsylvania Public Utility Commission in the above referenced matter, dated January 29, 1982, at Nos. C-812383 and P-810264 is hereby vacated and the matter remanded

to the Commission for disposition consistent with this opinion.

Jurisdiction is relinquished.