Irwin A. POPOWSKY, Consumer Advocate, Petitioner

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued March 31, 2004.

Decided July 13, 2004.

Dianne E. Dusman, Harrisburg, for petitioner.

Wayne T. Scott, Harrisburg, for respondent.

Anthony C. DeCusatis, Philadelphia, for intervenor, PA–American Water Co.

BEFORE: COLINS, President Judge, and McGINLEY, Judge, and SMITH–RIBNER, Judge, and PELLEGRINI, Judge, and COHN, Judge, and SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Irwin A. Popowsky, Consumer Advocate (Consumer Advocate), petitions for review of an adjudication of the Public Utility Commission (PUC) that adopted the recommendation of the Administrative Law Judge (ALJ) to dismiss three complaints filed against Pennsylvania–American Water Company (the Utility).[1] The complain-

---

1. The cases were consolidated by the ALJ, Larry Gesoff, and are captioned: *Irwin A. Popowsky, Consumer Advocate, Cindy Parks* *and Rick Minutello v. Pennsylvania–American*

ants requested the PUC to order the Utility to install, at the Utility's sole expense, approximately 19 miles of water mains and a one million-gallon storage tank in Mount Pleasant Township (Township) at a cost of $6.3 million. The PUC, however, held that this relief was not available to the complainants under the PUC's regulations applicable to water line extensions. We affirm.

## BACKGROUND

Cindy Parks (Parks) initiated this case on May 3, 2001, by filing a complaint with the PUC averring that her hometown of Hickory, located in the Township, lacks public water that surrounding areas enjoy. Parks requested that the Utility be required to provide public water to all the residents of Hickory. Reproduced Record at 1a (R.R.—). The Utility filed an answer generally denying the allegations and requesting the PUC to dismiss Parks' complaint.

Rick Minutello (Minutello) filed a complaint on July 18, 2002, in which he averred that the Utility planned to service all the homes on his street but refused to service his home. He requested that the PUC add his name to any litigation involving the Utility and its "refusal to service my growing area with water." R.R. at 14a. The Utility filed an answer to the Minutello complaint denying the allegations,[2] and asserting that the Utility was willing to implement an existing plan to provide water service to the Township if the terms and conditions of Rule 27 of the Utility's tariff[3] were satisfied. Under the Tariff, contributions in aid of construction (customer contribution)[4] would have to be made by each resident in the Township desiring service.

The Consumer Advocate intervened on behalf of Parks and filed its own complaint on August 21, 2002, alleging an inadequate water supply and poor water quality in the Township. It requested the PUC to order the Utility to provide an adequate supply of quality water to the Township without customer contribution. The Consumer Advocate also asserted that the Utility was in violation of Section 1501 of the Public Utility Code, 66 Pa.C.S. § 1501, which requires, in relevant part, that public utilities make extensions of service as may be necessary "for the accommodation, convenience and safety of ... the public."[5] On September 12, 2002, the Utility filed an answer, stating that it would extend its

---

*Water Company,* docket nos. C–20028361, C–00015377 and C–20028177.

2. The Utility, which has intervened in this appeal, specifically denied that it services any of the homes scattered along the rural road on which Minutello lives (Pleasant Road). It noted that, at one time, it proposed a main installation in Pleasant Road in front of the Minutello residence. R.R. 17a. However, the residents of the Township rejected the proposal.

3. Rule 27, Supp. No. 151, Tariff Water—Pa. P.U.C. No. 4, Fifth Revised Page 72 (Tariff).

4. The customer contribution would be the difference between the estimated project cost ($6,290,499) and the Utility-required investment ($4,612,800) or $1,677,699 under the formula provided in Section 65.21 of Title 52

of the Pennsylvania Code. *See infra* note 23. Assuming 744 applicants (the number of residential-equivalent applicants if the Township were to enact a mandatory connection ordinance), the customer contribution for each applicant would be $2,255. Under Rule 27.1(D)(2) of the Utility's tariff, the advance amount to be paid prior to construction is $752. The balance of $1,503 may be paid over 36 months.

5. Through its Public Statement the Consumer Advocate stated its intention to seek an order requiring the Utility to provide service to those citizens in need of an adequate supply of quality water without the condition of paying "contributions in aid of construction." Consumer Advocate Brief at 9.

mains to serve "bona fide service applicants" in accordance with the terms of Rule 27 of its Tariff.[6] The ALJ consolidated the complaints of Parks, Minutello and the Consumer Advocate.

Because the parties failed to reach a settlement, the ALJ conducted evidentiary hearings in Hickory and in Harrisburg. The ALJ took evidence on the questions of whether the project sought by the complainants was actually needed and whether it could be done by the Utility economically.

Township residents testified that their well water was inadequate in quality and quantity. They attributed the water degradation to malfunctioning septic systems, the use of Township land by livestock and the history of underground mining in the area. The Township lacks public sewers and only recently has begun to permit on-lot sewage treatment systems. Residents also testified that some wells produce insufficient water for normal household use, and that at least one house was destroyed by fire when firefighters ran out of water while trying to extinguish the flames. Water for fighting fires is brought in by tanker trucks; the need for fire hydrants was supported by the Township's Director of Public Safety. The lack of a water system has adversely affected property values and stymied development, according to the residents who testified.

The Township did not participate in the hearings before the ALJ. The record showed, however, that in 1989 the Township obtained public funding to partner with the Utility to install a water supply system in the Township. However, the plan was withdrawn by the Township Supervisors in the face of strong public opposition and litigation initiated to halt the project.[7] This experience was in stark contrast to other projects in Washington County, where the townships and the Utility worked together to extend water lines to previously unserved residents. By partnering with these other townships,[8] the Utility was able to extend its water lines without the need for customer contribution.

With respect to the economics of the water project sought by the complainants, the Consumer Advocate offered evidence to show that there were 568 potential water customers in the Township. This number was based upon the results of a survey of 701 residents. Of 530 residents who responded, 430 (or 81%) stated that they would connect to the public water system if customer contribution was not required. From these survey results, the Consumer Advocate "extrapolated" an estimated total of 568 customers in the Township. R.R. 857a.

The Utility produced evidence to show that the project would cost $6.3 million.[9] Using the criteria in the PUC's regulation

---

**6.** The Utility averred in new matter that Rule 27 of the Utility's Tariff sets forth the terms and conditions on which it will extend its mains to a *bona fide* applicant for service and that Rule 27 is in compliance with PUC regulation at 52 Pa.Code § 65.21. *See infra* note 23 for text of Section 65.21. Rule 27 was filed in accordance with the PUC's line extension regulation and approved by the PUC.

**7.** The residents were divided about future growth in the Township. The absence of a public water supply or a public sewerage system is generally understood to inhibit growth.

**8.** In these projects, the township adopted a mandatory connection ordinance to maximize the number of customers. To the extent the ordinance would still not produce enough customers to eliminate the need for a customer advance, public grants were used. In this way, the Utility was able to provide water service without the need for customer contribution.

**9.** At the hearing, the Consumer Advocate contended that by installing smaller mains and foregoing a water tower, the project could be done for $5.2 million. The ALJ rejected this argument. The ALJ found the Utility's design

at 52 Pa.Code § 65.21,[10] the Utility showed that it would be required to invest $6,200 for each *bona fide* applicant. By contrast, the Utility's investment in its existing facilities that are servicing existing customers is $2,309.[11] Using the Consumer Advocate's estimate of 568 customers, the Utility's investment would be $11,092 per customer. If the 568 customers did not materialize, the funding gap would widen. On the other hand, if more customers were added at any time up to ten years after customer contributions were made, refunds would be returned to the original contributors.[12] In this way, the *bona fide* applicants, not the Utility, would benefit from the growth in the number of customers.

Evidence was also produced to show the actual amount of the customer contribution for the project as calculated under the regulations and under Rule 27 of the Utility's tariff.[13] Assuming the project would service 744 residential customers, each customer would have to contribute $2,255. Customers would be able to finance this payment by paying the Utility a one-third down payment and paying the balance over three years at an interest rate equal to the Utility's cost for long-term debt. The Utility also identified three banks in Washington County offering home equity loans at 4.75%.[14] The pre-tax cost of the loan would be less than $30 per month. This, along with the average monthly water bill, would approximate the costs of the complainants' present on-site water systems.

The ALJ concluded that the residents of the Township needed a dependable source of water; however, he concluded that this need did not translate into a duty by the Utility to extend its service without customer contribution. The ALJ rejected both the Consumer Advocate's estimate of 568 customers and the Utility's estimate of 744[15] customers as mere speculation. The ALJ found that the number of *bona fide* applicants was unknown. In fact, not a single person had applied for service in the Township. The ALJ, thus, concluded that (1) the complaints were governed by the line extension regulations; (2) under those regulations, service could not be provided

---

criteria for the project to be sound, and its cost estimates appropriate.

10. Under 52 Pa.Code § 65.21(2), the utility must invest the amount that will generate annual extension costs equal to annual revenue from the extension.

11. This investment amount was used in the Utility's 2001–2002 base rates approved by the PUC.

12. Notably, under the line extension regulations, revenue from an extension constructed with customer contribution cannot generate any profit to the utility governed by the regulation.

13. See *supra* note 3.

14. The record demonstrates that the Utility identified three banks in Washington County that during October 2002 were offering home

equity loans at 4.75% to finance a customer contribution at a monthly amount of less than $30. That finance amount plus the monthly public water bill would be equal to or less than the expenses already being incurred by most of the witnesses (including the capital expenditures and maintenance costs for well pumps, "coyote" systems, filters and treatment devices). Witnesses testified that fire insurance premiums would be reduced with the availability of fire hydrants and the market value of homes and businesses would increase.

15. The Utility's estimate assumed that the Township would enact an ordinance mandating participation. The ALJ observed that this course was begun and then rejected by the Township in 1989 at a time when no customer contribution was contemplated because of grants that were available. No evidence was offered to show that an ordinance requiring contribution would succeed politically this time.

without customer contribution; and (3) there was neither a legal ground nor factual justification to grant a wholesale exception to the regulations in this case. In the absence of any *bona fide* applicants, the line extension regulations were incapable of application, effectively mooting the question of whether or not customer contribution was appropriate.[16] Therefore, the ALJ recommended that the complaints be dismissed.

The Consumer Advocate filed exceptions to the ALJ's Initial Decision, and the Utility filed reply exceptions. The PUC entered an Opinion and Order on August 8, 2003, denying the exceptions filed by the Consumer Advocate and adopting the ALJ's Initial Decision.[17] This appeal followed.[18]

On appeal,[19] the Consumer Advocate challenges the PUC's decision that Township residents must contribute to the cost of extending the Utility's main to the Township. His appeal raises six issues

that may be summarized as follows: (1) whether the PUC erred in its application of the line extension regulation, thereby violating definitive Pennsylvania case law holding that a utility must bear the capital expense of extending service where there is a public need for that service; (2) whether the PUC improperly nullified its duty to adjudicate complaints by accepting the Utility's interpretation of Rule 27 of its Tariff; and (3) whether the PUC's adjudication is supported by substantial evidence. We consider these issues *seriatim.*

## I.

■ The gravamen of the Consumer Advocate's appeal is that the PUC's line extension regulations are unlawful, as applied by the PUC in this case. It is undisputed that these regulations were adopted in compliance with the substantive and procedural requirements of the Commonwealth Documents Law,[20] the Commonwealth Attorneys Act,[21] and the Regulatory Review Act.[22] However, the Consumer

16. Nevertheless, the ALJ also addressed and rejected the Consumer Advocate's alternative argument: assuming that the regulation did not allow an exception for public need, the Utility could construct the project without consumer contribution. To advance this argument, the Consumer Advocate offered evidence to show that the project could be done for $5.2 million and that a low-interest loan from the Pennsylvania Infrastructure Investment Authority (Penn Vest) to the Utility would reduce the financing cost. By changing these numbers in the formula in Rule 27 of the Utility's Tariff, the project would generate sufficient revenue to cover the cost of construction.

17. Minutello filed a letter disagreeing with the Initial Decision. The PUC did not address the objections raised in Minutello's letter because the letter did not meet the formal or substantive requirements of 52 Pa.Code § 5.533(b) and could not, therefore, be considered as exceptions. PUC Opinion and Order at 1 n. 1.

18. The Consumer Advocate filed its *Brief for Petitioner* on November 26, 2003. The PUC

filed its *Brief for Respondent* on January 28, 2004. The Utility, as Intervenor, filed its brief on January 27, 2004. *Amicus curiae* briefs were filed by Minutello and Shawn Staley, both residents in the Township.

19. This Court's standard of review of the PUC's decision is limited to a determination of whether constitutional rights have been violated, an error of law committed or whether the findings, determinations or order are supported by substantial evidence. 2 Pa.C.S. § 704; *Equitable Gas Company v. Pennsylvania Public Utility Commission,* 113 Pa. Cmwlth. 68, 536 A.2d 846, 848 (1988).

20. Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §§ 1102–1602.

21. Section 204(b) of the Act of October 15, 1980, P.L. 950, 71 P.S. § 732–204(b).

22. Act of June 25, 1982, P.L. 633, reenacted and amended by Act of June 30, 1989, P.L. 73, 71 P.S. §§ 745.1–745.15.

Advocate contends that the regulations conflict with the duty that every utility has under Section 1501 of the Public Utility Code, 66 Pa.C.S. § 1501, to provide service to the public where a need for the service has been demonstrated. A utility's duty under Section 1501 is such that the PUC has to be able to exempt certain extensions from customer contribution, on a case-by-case basis, where the exemption would not cause the utility material, economic harm. The absence of an exemption procedure, the Consumer Advocate contends, renders the regulation unlawful. In response, the PUC contends there is no basis for granting wholesale exemptions from the extension regulations.

23. Section 65.21 provides:
    Duty of public utility to make line extensions.
    Each public utility shall file with the [PUC], as part of its tariff, a rule setting forth the conditions under which facilities will be extended to supply service to an applicant within its service area. Upon request by a bona fide service applicant, a utility shall construct line extensions within its franchised territory consistent with the following directives:
    (1) *Line extensions to bona fide service applicants shall be funded without customer advance if the annual revenue from* the line extension *will equal or exceed the utility's annual line extension costs.*
    (2) If the annual revenue from the line extension will not equal or exceed the utility's annual line extension costs, a bona fide service applicant may be required to provide a customer advance to the utility's cost of construction for the line extension. *The utility's investment for the line extension shall be the portion of the total construction costs which generate annual line extension costs equal to annual revenue from the line extension.* The customer advance amount shall be determined by subtracting the utility's investment for the line extension from the total construction costs.
    (3) The utility's investment for the line extension shall be based on the following formula, where X equals the utility's investment attributed to each bona fide applicant:
    X  = [AR-OM] divided by [I + D]; and,
    AR = the utility's annual revenue

These regulations, found at 52 Pa.Code §§ 65.1 and 65.21–65.23, establish a duty in a public utility to provide line extensions to *bona fide* service applicants without customer contribution where the annual expected revenues equal or exceed the annual expenses and capital costs associated with the new line. 52 Pa.Code § 65.21.[23] If the annual revenue does not equal or exceed the line's annual costs, then the utility may require a contribution from customers that is proportional to the annual costs not covered by the annual revenue. 52 Pa. Code § 65.21(2). The regulations were adopted pursuant to Section 1501 of the Public Utility Code,[24] which expressly authorizes a utility, with the approval of the PUC, to adopt "reasonable rules and regu-

OM = the utility's operating and maintenance costs
I  = the utility's current debt ratio multiplied by the utility's weighted long-term debt cost rate
D  = the utility's current depreciation accrual rate

52 Pa.Code § 65.21 (emphasis added).

24. Section 1501 provides:
    *Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service* and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities *as shall be necessary or proper for* the accommodation, convenience, and safety of its patrons, employees, and *the public.* Such service also shall be reasonably continuous and without unreasonable interruptions or delay. *Such service and facilities shall be in conformity with the regulations and orders of the commission. Subject to the provisions of this part and the regulations or orders of the commission, every public utility may have reasonable rules and regulations governing the conditions under which it shall be required to render service.* Any public utility service being furnished or rendered by a municipal corporation beyond its corporate limits shall be subject to regulation and control by the commission as to service and extensions, with the same force and in like manner as if such service were rendered by a public utility. The commission shall have sole and exclusive jurisdiction to promulgate rules and regulations for the allocation

lations governing the conditions under which it shall be required to render service." 66 Pa.C.S. § 1501. The PUC determined that it was reasonable to require customer contributions to an extension if necessary to prevent the utility from a negative return on investment, *i.e.*, the utility must realize at least a "break even" return on mandated extensions.

The PUC spent three years finalizing the line extension regulations. They express the PUC's definitive statement of the "reasonable conditions" under which a public utility must provide main extensions to *bona fide* service applicants.[25] In adopting these conditions, the PUC balanced the interests of the *bona fide* service applicants, the utility, and the utility's existing customers, explaining as follows:

> In other words, the *claim of an individual seeking the line extension must be balanced against the right of the public utility to remain financially viable and the right of existing customers to avoid subsidizing uneconomic line extensions* for new customers.... Thus, the purpose of this rulemaking is to create a fair, reasonable and predictable economic standard to address this regulatory problem that will eliminate uncertainty and greatly reduce the litigation in this area.

27 Pa. B. 799, 800 (1997) (emphasis added). In short, new customers will be required to contribute to the cost of a utility's extension where necessary to protect that utility's existing customers from excessive rates or to preserve the financial viability of the utility.

The Consumer Advocate contends that this "break-even analysis," which is the foundation of the line extension regulations, is not reasonable. He contends Section 1501 has been interpreted to require a utility to provide safe and adequate service to an area lacking public water without customer contribution where a public need exists. In other words, need *alone* is a sufficient basis for requiring the Utility to extend its water mains without charging any of the expense to the new customers, other than a monthly water bill. The PUC rejected this argument in its adjudication, noting it has consistently held that public need does not invalidate the regulation's requirement for customer contribution in some circumstances.[26] PUC Opinion and Order at 5, 6.

To advance his "public need" argument, the Consumer Advocate relies principally upon the holding in *Ridley Township v. Pennsylvania Public Utility Commission,* 172 Pa.Super. 472, 94 A.2d 168 (1953).[27]

of natural or artificial gas supply by a public utility.
66 Pa.C.S. § 1501 (emphasis added).

**25.** The regulations were approved by the PUC's Order, the Independent Regulatory Review Commission (IRRC) and the Senate Committee on Consumer Protection and Professional Licensure; the regulations became final upon publication in the *Pennsylvania Bulletin. See* 27 Pa. B. 799, 804 (1997).

**26.** The PUC cites its previous determinations in *Popowsky v. Pennsylvania–American Water Company,* Docket No. R–00943155C001, 1997 Pa. PUC LEXIS 143, 1997 WL 1050746 (Order entered June 9, 1997) (specifically rejecting the public need exception to the regula-

tions); and *Collier Township v. Pennsylvania–American Water Company,* Docket No. C–00934978 (Order entered March 18, 1996) (evidence of contaminated and insufficient wells did not overcome the economic standards set forth in the line extension regulations).

**27.** The Consumer Advocate also cited *Riverton Consolidated Water Company v. Public Service Commission,* 105 Pa.Super. 6, 159 A. 177 (1932); *McCormick v. Pennsylvania Public Utility Commission,* 48 Pa.Cmwlth. 384, 409 A.2d 962 (1980); and *Fairview Water Company v. Pennsylvania Public Utility Commission,* 55 Pa.Cmwlth. 96, 422 A.2d 1209 (1980). Neither *McCormick* nor *Fairview,* however, dealt with extensions to new customers. *Riv-*

The Consumer Advocate contends that *Ridley* requires public utilities to provide service without customer contribution unless the utility can demonstrate "material economic harm to the utility or undue burden upon existing customers." Consumer Advocate Brief at 21. We disagree.

In *Ridley*, twelve homeowners sought an extension of a public water utility's facilities to a residential section of a township, a part of which was already served by the utility. In addition, the township requested the installation of fire hydrants. Despite evidence showing that the extension would entail the expenditure of less than one-fourth of one percent (0.25%) of the company's current and accrued assets, the PUC concluded that it was "not economically feasible" for the utility to extend its mains and did not require the extension. *Ridley*, 94 A.2d at 170. The service applicants appealed, and the Superior Court reversed. It found that under the Public Utility Code,[28] a utility may not serve only the presently profitable territory covered by its franchise. The Superior Court reasoned as follows:

> *A public utility cannot collect the cream in its territory and reject the skimmed milk. . . . If a portion of the territory served is not profitable, but the entire service produces a fair return on the investment, the utility may still be required to serve the unprofitable portion, if the rendering of such service does not result in an unreasonable burden on its other service.*
>
> . . .
>
> *Ordinarily, it is not the business of the citizen or consumer to construct any part of a utility's system. There are, doubtless, instances where, under special circumstances, warranted by the evidence, the Commission may, in the exercise of its administrative discretion, withhold exercise of its power unless patrons offer to participate in the cost of construction. . . . But no inflexible rule can be laid down; participation in construction costs cannot be exacted indiscriminately; and it cannot be required upon a mere showing that an extension will not immediately produce an adequate profit.*

*Ridley*, 94 A.2d at 171 (emphasis added) (citations omitted). Thus, the Superior Court held that affected members of the public "are entitled to fire protection and domestic water service without subsidizing a large and prosperous utility," but it also clarified that customers may be required to participate in the cost of the construction of service extensions in appropriate circumstances. *Ridley*, 94 A.2d at 172.

The PUC and the Utility contend, and we agree, that *Ridley* does not stand for the broad proposition that utilities must provide service without customer contribution unless it would cause the utility material, economic harm.[29] *Ridley* expressly

---

erton did deal with extensions. However, it was a confiscation case, which is not at issue here, and it was found in *Riverton* that the utility could not prove its allegation of unlawful confiscation.

**28.** It interpreted Section 1171 of the Public Utility Code, 66 P.S. § 1171, which was subsequently codified at Section 1501, 66 Pa.C.S. § 1501.

**29.** As noted by the Utility, it is problematic to use the Consumer Advocate's hardship standard which looks to the "overall impact" of individual main extensions on a case-by-case basis. First, a large utility may receive hundreds of extension requests each year, and a small utility only one or two. Second, it is unworkable. It will require the regulators to find the *particular* extension, together with the sum of preceding investments, that finally "materially handicaps" the Utility's ability to earn a return on its investments. It would require the PUC to find the proverbial "straw" that will break the camel's, or utility's, back.

contemplates that the PUC has discretion to define the appropriate circumstances for customer contribution to an extension of service. Subsequent holdings support this understanding of *Ridley*. In *Colonial Products Company v. Pennsylvania Public Utility Commission*, 188 Pa.Super. 163, 146 A.2d 657 (1958), the Superior Court held that contributions can be required when the benefits of a proposed improvement accrued primarily to that customer. The PUC has identified additional circumstances that justify customer contribution to the cost of extending water service. These include an extension sought by a developer or an extension that will generate less revenue than the utility's cost of construction. *Lynch v. Public Utility Commission*, 140 Pa.Cmwlth. 599, 594 A.2d 816, 818 (1991).

▮▮ In any case, *Ridley* is not dispositive because it was decided prior to the promulgation of the line extension regulations, which govern customer contribution to extensions. The fact that a prior appellate case may support a narrow interpretation of a statutory provision does not bind the agency to that interpretation. A regulation must be followed even if prior case law supports a narrower interpretation. *Elite Industries, Inc. v. Pennsylvania PUC*, 574 Pa. 476, 483, 832 A.2d 428, 432 (2003).

Section 1504 of the Public Utility Code gives the PUC the express power to prescribe by regulations "just and reasonable standards ... to be furnished, imposed, observed and followed by any or all public utilities." *Rohrbaugh v. Pennsylvania Public Utility Commission*, 556 Pa. 199, 206, 727 A.2d 1080, 1084 (1999) (quoting 66 Pa.C.S. § 1504(1)). In its order adopting the line extension regulations, the PUC specifically stated that the regulations were consistent with *Ridley*, noting that a negative equity return is a material handicap. The language in Section 1501 that "every public utility may have reasonable rules and regulations governing the conditions under which it shall be required to render service" is critical here. The line extension regulations set parameters on the Utility's rules for water main extensions, and Rule 27 of the Utility's Tariff was approved by the PUC because it met the standards in the line extension regulations.

▮▮ The Commission's regulations are binding on this Court as long as they conform to the Commission's grant of delegated power, are issued in accordance with the proper procedures, and are reasonable. *Moyer v. Berks County Board of Assessment Appeals*, 803 A.2d 833, 842 (Pa. Cmwlth.2002) (citing *Pennsylvania Human Relations Commission v. Uniontown Area School District*, 455 Pa. 52, 313 A.2d 156 (1973)). When reviewing an agency's interpretation of its own regulations,[30] courts follow the following two-step analysis:

> First, the administrative interpretation will be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. Second, the regulation must be consistent with the statute under which it is promulgated.

*Moyer*, 803 A.2d at 844. The PUC's interpretation of the line extension regulations is not clearly erroneous, and the regulation is consistent with the interpretation of Section 1501 of the Public Utility Code announced in *Ridley* and in subsequent case law.

▮▮ The PUC, like any other agency, cannot ignore or fail to apply its own regulations, and those persons subject to the

---

**30.** An agency's interpretation of its own regulation and its governing statute are entitled to deference by reviewing courts. *Peoples Natu-* *ral Gas Company v. Pennsylvania Public Utility Commission*, 47 Pa.Cmwlth. 512, 409 A.2d 446 (1979).

agency's regulation are also bound. *Teledyne Columbia–Summerill Carnegie v. Unemployment Compensation Board of Review,* 160 Pa.Cmwlth. 17, 634 A.2d 665 (1993). The "public need" exception advocated by the Consumer Advocate in this appeal would vitiate the line extension regulations in violation of the rule set forth in *Teledyne.* As a practical matter, it would mean that all line extension disputes could only be resolved by ponderous and protracted case-by-case litigation on the question of whether the utility's condition for service extension was reasonable. It was precisely this result that the PUC sought to prevent by promulgating the line extension regulations. Section 1501 of the Public Utility Code specifically grants the PUC legislative rulemaking authority to adopt regulations implementing the general service requirements therein provided. Rule 27, as part of the Utility's approved tariff, is legally binding on both the Utility and its customers. *Brockway Glass Company v. Public Utility Commission,* 63 Pa.Cmwlth. 238, 437 A.2d 1067, 1070 (1981).

Accordingly, we hold that the PUC did not err in its application of the line extension regulations to these circumstances and that the regulations do not conflict with Section 1501 of the Public Utility Code. The complaints were properly dismissed on this basis.

## II.

▪ The Consumer Advocate contends that the PUC has limited all line extension disputes to the "sole factor" of the "break-even analysis" codified in the regulations. He argues that this approach effectively precludes the filing of individual complaints under Sections 1505 and 701 of the Code,[31] and, thus, it unlawfully restricts or nullifies the adjudicatory responsibilities with which the PUC has been charged by the legislature.

The Consumer Advocate advances a somewhat contradictory argument. First, he maintains that the PUC *relinquished all discretion* by adopting a rigid interpretation of the line extension regulations that makes the "break-even analysis" the determinative factor for customer contribution. Next, the Consumer Advocate argues that the PUC erred by *not exercising its discretion* to waive the requirements of the regulations based upon the "dire need" of the residents of the Township. More to the point, the Consumer Advocate's argument that the PUC has abdicated its responsibility to adjudicate consumer complaints is simply a rephrasing of its initial argument: where public need is established, the utility must bear all the costs of extending service.

The regulations promulgated by the PUC establish a workable and practical standard for line extensions. It establishes the maximum investment that the PUC can require a utility to invest in an extension.[32] The regulations may generate factual disputes regarding the application of the regulation in a particular case and that, in turn, will generate the need for an adjudicatory action by the PUC. The fact that the PUC has established standards that give meaning to the requirement in Section 1501 that a utility establish "reasonable conditions" for extending service is not an abdication of responsibility. To the contrary, giving precision to what otherwise may be characterized as an open-ended statute[33] is a

---

**31.** 66 Pa.C.S. § 1505(a) and 66 Pa.C.S. § 701.

**32.** For its own business reasons, however, a utility *may* invest more. 52 Pa.Code § 65.21(2).

**33.** The line extension regulations give substance and clarity to the statutory directive that a utility adopt "reasonable" rules governing the conditions under which it shall extend service to new customers as necessary for the "convenience" and "safety" of the public. 66

proper exercise of the PUC's responsibility.

### III.

██ Finally, the Consumer Advocate contends that the decision of the PUC is not supported by substantial evidence. The Consumer Advocate asserts that the PUC capriciously disregarded the evidence that showed there were hundreds of *bona fide* applicants in the Township. Further, there was no evidence that to require the Utility to spend $6.3 million would materially handicap the Utility.[34] The Consumer Advocate also argues that even using the formula in the regulation, the evidence in the record supports the conclusion that the Utility could have constructed the project on a "break-even" basis.

The Consumer Advocate relies upon the "least-cost" principle to determine the cost of the construction and financing of the Township's water project. The "least-cost" approach[35] would establish that the Utility could cover the costs of the project. This argument is grounded in the assumption that the Utility could obtain a low-interest loan from Penn Vest. A 1.387% interest rate for a Penn Vest loan, instead of the Utility's 4.85% weighted cost of debt, would change the outcome using the formula in the regulation. By using the Penn Vest interest rate in place of the

Utility's 4.85% interest rate, the project would break even at 401 customers.

The ALJ and the PUC rejected the "least-cost" approach because it was inconsistent with the regulation. "Targeting" low cost debt to *particular* extensions would be unfair to other *bona fide* applicants that did not qualify for Penn Vest. PUC Opinion and Order at 12. Further, the PUC found that interest under a Penn Vest loan is 2.427%, not 1.378%, as asserted by the Consumer Advocate. *Id.*[36] As noted by the Utility, using 2.427% in the formula and assuming 568 customers, the total of the resulting investment would be $5,183,000, far short of the $6.3 million needed for the project.

However, the ALJ found that there were no *bona fide* applicants, which renders the "least-cost" approach an abstract exercise. The ALJ rejected the number of applicants advanced by the Consumer Advocate at the hearings that was extrapolated from its survey. The ALJ found that because residents of the Township previously opposed the installation of a public water system, and the Township has not mandated connection to the proposed system, the number of residents posited by the Consumer Advocate was too speculative to use.

The line extension regulations define a "bona fide service applicant" as "[a] person

---

Pa.C.S. § 1501. These statutory standards are inexact. The regulation preserves Section 1501 from a claim that "reasonable" is unconstitutionally inexact or vague. *See, e.g., Fumo v. Insurance Department,* 58 Pa. Cmwlth. 392, 427 A.2d 1259, 1262 (1981) (finding that existing regulations adequately clarified language in Insurance Department Act challenged as unconstitutionally vague).

**34.** These arguments do not go to lack of substantial evidence. They are at most a repeat of the Consumer Advocate's legal argument that where there is a public need for service, the Utility must provide the service without customer contribution.

**35.** The Consumer Advocate concedes that the Public Utility Code does not expressly mandate a utility to incur the "least cost" in providing service, but it contends that it is implicit in the mandate for "efficient" service. The PUC rejected the contention that "least-cost" principles have no basis in law or in PUC precedent.

**36.** The introductory rate on a Penn Vest loan is 1.378% but, thereafter, the interest rate increases to 2.774%, which makes the average 2.427%.

or entity applying for water service to an existing or proposed structure within the utility's certificated service territory for which a valid occupancy or building permit has been issued if the structure is either a primary residence of the applicant or a place of business." 52 Pa.Code § 65.1. Rule 27 of the Utility's Tariff[37] entitled, "Main Extensions for Bona Fide Service Applicants," provides that where the costs of main extension exceed the company contribution[38] the extension will only be made under the terms of an Extension Deposit Agreement for Bona Fide Service Applicant which incorporates the provisions of the rules (the Tariff) and the regulations.[39]

■ A *bona fide* service applicant under Rule 27 of the Utility's Tariff is specifically limited to a person who has applied for water service to an existing structure that is either the primary residence or place of business of the applicant and is located within the company's certificated service territory. In addition, ·the applicant must file a signed application for a new street service connection, extend the service line to the curb line of the premises, agree to separate any existing private well system from the public water system, and request water service to begin immediately upon installation of the street service connection. These tariff requirements for a *bona fide* applicant are absolute; deviation from an approved tariff is not permitted under any pretext. *Philadelphia Suburban Water Company v. Pennsylvania Public Utility Commission*, 808 A.2d 1044, 1054–1055 (Pa.Cmwlth.2002).

We cannot substitute our judgment for the factfinder. There was no evidence that a Penn Vest loan was available for the project sought by the complainants. Notably, no one from Penn Vest testified at the hearing. We agree also with the ALJ that the number of residents that would connect to the system was speculative. The

**37.** The Tariff was approved by the PUC and became effective on December 18, 1999. Rule 27, Supp. No. 151, Tariff Water—Pa. P.U.C. No. 4. PUC Tariff Rule 27.1 states in pertinent part as follows:

**27. MAIN EXTENSIONS FOR BONA FIDE SERVICE APPLICANTS**
27.1 General Provisions
* * *
(A) (2) When the costs of the main extension exceed the Company Contribution ..., then such extension will be made under and pursuant to the terms of an Extension Deposit Agreement for Bona Fide Service Applicant.... The construction of facilities to serve such Bona Fide Service Applicant will not commence until an Extension Deposit Agreement for Bona Fide Service Applicant has been executed and all applicable terms and conditions therein have been satisfied by the Applicant. The introductory rate on a Penn Vest loan is 1.378% but, thereafter, the interest rate increases to 2.774%, which makes the average 2.427%.
* * *
(B) The Company shall have exclusive right to determine the type and size mains to be installed and the other facilities required to render adequate service.

**38.** "Company Contribution" shall mean that portion of the main extension costs which the Company will fund based upon the following formula:

Average Annual Revenue minus $_____
Operation and Maintenance Expenses $_____
Subtotal $_____
Divided by Depreciation Rate
and weighted cost of debt _____%
Company Investment $_____
Rule 27(D) (2), Supp.No. 151, Tariff Water—Pa. P.U.C. No. 4.

**39.** Construction of a main extension will not commence until the Agreement is executed, and the terms and conditions of the Agreement have been satisfied by the applicant.

ALJ did not disregard evidence in the record; rather, he reached a conclusion from the evidence that was different than that argued by the Consumer Advocate. In the end, the PUC concluded, and we agree, that "*bona fide* applicant" is a term of art defined in Rule 27 of the Utility's Tariff. The Consumer Advocate's number extrapolated from its survey, even if accepted, does not identify a single *bona fide* applicant. It identifies the number of persons that *might* become *bona fide* applicants, and that identification is inadequate for purposes of the regulation. As found by the ALJ, and affirmed by the PUC, in the absence of a single agreement in place, the regulation cannot be applied.

Accordingly, the Consumer Advocate's claim that the PUC's adjudication is not supported by substantial evidence must be rejected.

## CONCLUSION

The Consumer Advocate believes that where a need for public utility service is demonstrated, then a utility must invest in an extension of service even where the utility will experience a negative return on this investment. This shortfall would have to be borne by the utility's shareholders or by its existing customers, who already generate profits for the utility. The Consumer Advocate may disagree with the reasonableness of the standards adopted by the PUC in its line extension regulation, but he cannot show that the PUC had exercised its statutory authority unlawfully. The standards adopted by the PUC, after much care and research, balance the competing interests affected by a service extension. We hold that the line extension regulations do not conflict with Section 1501 of the Public Utility Code, 66 Pa.C.S. § 1501, and, thus, have the force and effect of law. Further, they were properly ap-

plied in this case. The PUC did not relieve the Utility from having to extend service in the Township but only from having to do so on the conditions sought by the complainants.

For these reasons, we affirm the adjudication of the PUC.

## ORDER

AND NOW, this 13th day of July, 2004, the order of the Public Utility Commission dated August 8, 2003, in the above-captioned matter is affirmed.

DISSENTING OPINION BY Judge SMITH-RIBNER.

I respectfully dissent from the majority's decision to affirm the order of the Public Utility Commission (Commission) because its application of the line-extension regulations at 52 Pa.Code §§ 65.21–65.23 eliminates "public need" from any consideration as an independent factor in determining when customer advances may be required for a water service line extension project. The Commission's application of those regulations is at odds with Section 1501 of the Public Utility Code, 66 Pa.C.S. § 1501, which provides in relevant part:

> Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public. . . . Such service and facilities shall be in conformity with the regulations and orders of the commission.

When interpreting Section 1501 and its predecessor statute,[1] the appellate courts

---

1. Section 401 of the Act of May 28, 1937, P.L. 1053, *as amended, formerly* 66 P.S. § 1171, repealed by Section 2 of the Act of July 1, 1978, P.L. 598.

have generally concluded that the costs associated with maintaining and expanding the physical facilities necessary to provide utility service must be assumed initially by the public utility.[2] In circumstances in which there is no public need for improvements or extensions in service, e.g., when the proposed project involves special services or benefits only a particular customer or developer, the Commission and courts have approved the assessment of customer contributions.[3] Similarly, it has been held that a public utility may not be required to bear prohibitive costs in extending service or to sustain such expenses as would materially handicap the utility in securing a fair return on its overall operations.[4]

In the "break-even" formula contained in 52 Pa.Code § 65.21, the Commission sets forth a rule that determines a public utility's financial obligation for service extension in terms of costs and revenue, without separate regard for the degree of public need for the service extension. I recognize that the Commission has authority to formulate such rules and that in doing so it may within limits amend prior interpretations of statutory mandates. *Elite Industries, Inc. v. Pennsylvania Public Utility Comm'n,* 574 Pa. 476, 832 A.2d 428 (2003); *Rohrbaugh v. Pennsylvania Public Utility Comm'n,* 556 Pa. 199, 727 A.2d 1080 (1999). However, the Commission's application of its regulations may not conflict with fundamental statutory principles, and when the Commission ex-

ceeds its statutory authority an appellate court may find an abuse of discretion. Section 501 of the Public Utility Code, 66 Pa.C.S. § 501; *Rohrbaugh; Pennsylvania Electric Co. v. Pennsylvania Public Utility Comm'n,* 166 Pa.Cmwlth. 413, 648 A.2d 63 (1994).

Here, the Commission's application of its regulations *categorically* excludes public need as an independent factor in determining whether customer contributions may be assessed for the benefit of the Pennsylvania–American Water Company (PAWC), and in doing so the Commission contravenes the mandate of Section 1501 of the Public Utility Code that a public utility "shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public." By entirely excluding public need from its consideration, the Commission has applied its regulations in a manner that represents an abuse of discretion and reversible error.

This conclusion does not advance the notion that a public utility must extend service in all cases no matter what the cost or foreclose the notions that the costs of an extension project may in some cases outweigh any professed public need for increased service or that the Commission may employ its break-even analysis in esti-

2. *See Kossman v. Pennsylvania Public Utility Comm'n,* 694 A.2d 1147 (Pa.Cmwlth.1997); *Huntingdon, Inc. v. Pennsylvania Public Utility Comm'n,* 76 Pa.Cmwlth. 387, 464 A.2d 601 (1983); *Fairview Water Co. v. Pennsylvania Public Utility Comm'n,* 55 Pa.Cmwlth. 96, 422 A.2d 1209 (1980); *McCormick v. Pennsylvania Public Utility Comm'n,* 48 Pa.Cmwlth. 384, 409 A.2d 962 (1980); *Colonial Products Co. v. Pennsylvania Public Utility Comm'n,* 188 Pa.Super. 163, 146 A.2d 657 (1958); *Ridley Tp. v. Pennsylvania Public Utility Comm'n,* 172 Pa.Super. 472, 94 A.2d 168 (1953).

3. *See Kossman; Lynch v. Pennsylvania Public Utility Comm'n,* 140 Pa.Cmwlth. 599, 594 A.2d 816 (1991); *Colonial Products Co.; United Natural Gas Co. v. Pennsylvania Public Utility Comm'n,* 153 Pa.Super. 252, 33 A.2d 752 (1943).

4. *See Colonial Products Co.; Ridley Tp.; Sherman v. Public Service Comm'n,* 90 Pa.Super. 523, 1927 WL 4624 (1927).

mating the investment requirements for a project. However, pursuant to Section 1501 of the Public Utility Code, the Commission must weigh public need as a factor in determining whether service should be extended without customer contributions, and that process must acknowledge in some circumstances that public need will in fact outweigh the requirements of the Commission's regulations. In making such an assessment, the court noted in *Ridley Tp. v. Pennsylvania Public Utility Comm'n*, 172 Pa.Super. 472, 94 A.2d 168, 171 (1953):

> Ordinarily, it is not the business of the citizen or consumer to construct any part of a utility's system. There are, doubtless, instances where, under special circumstances, warranted by the evidence, the Commission may, in the exercise of its administrative discretion, withhold exercise of its power unless patrons offer to participate in the cost of construction. But no inflexible rule can be laid down; participation in construction costs cannot be exacted indiscriminately; and it cannot be required upon a mere showing that an extension will not immediately produce an adequate profit. (Citation omitted.)

On the record before the Court, there can be little doubt that those portions of Mt. Pleasant Township requesting service are in need of a public water system. The record contains abundant evidence of contaminated wells and of inadequate supplies of water for drinking and fire protection. The degree of public need in this case is not one of mere accommodation or convenience but one affecting public health and safety, and the Commission erred in concluding that absent customer contributions PAWC need not extend water service to the affected area. Instead, the Commission should have granted a waiver of its regulations and then determined the degree of service extension required. The Commission's order should be vacated and the case remanded for determination of those requirements.

President Judge COLINS joins in this dissent.

