TRUSTEES OF the PROPERTY OF PENN CENTRAL TRANSPORTATION CO. et al., Plaintiffs,

v.

UNITED STATES RAILWAY ASSOCIATION et al., Defendants (two cases).

Civ. A. Nos. 77–35, 77–36.

Special Court,
Regional Rail Reorganization Act.

Jan. 8, 1979.

Paul R. Duke, Covington & Burling, Washington, D. C., for plaintiffs.

David Manning, U. S. Ry. Ass'n, Washington, D. C., for defendant U. S. Ry. Ass'n.

Laurence Z. Shiekman, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant Consolidated Rail Corp.

WISDOM, Judge:

The plaintiffs in these actions, the Penn Central Trustees and certain affiliates of Penn Central, seek a declaration of rights to amounts owed by three states for the taking of certain properties to construct highway crossings and similar facilities. No. 77–35 involves properties of the plaintiffs that were occupied or to be occupied by the states of Ohio and Indiana under agreements executed before April 1, 1976, the date on which the plaintiffs' rail properties were conveyed to ConRail. No. 77–36 concerns properties the plaintiffs formerly owned that the Commonwealth of Pennsylvania appropriated under orders of the Pennsylvania Public Utility Commission ("PUC") issued before the conveyance date. The highway improvements constructed, or in some instances, to be constructed, abut or cross railroad properties conveyed by the plaintiffs to ConRail on April 1, 1976, under the Final System Plan and this Court's conveyance order of March 25, 1976. The parties have staked conflicting claims to the appropriation proceeds. We rule in favor of ConRail in No. 77–35 and in favor of the plaintiffs in No. 77–36.

## I

The parties have filed stipulations of fact in both cases.

No. 77–35 involves seventeen highway projects in Ohio and one in Indiana. In these states, the construction of highways and highway facilities crossing or abutting railroad properties is begun by the execution of an agreement between state authorities and the affected railroad permitting the state to enter upon the property and commence construction before the execution of documents transferring any property interest to the state. In many cases the construction is completed before the formal transfer of the property interest and before the state pays any compensation for the property. Ohio and Indiana followed this procedure in appropriating the properties at issue in this case during the Penn Central reorganization proceedings. The various highway projects were at differing stages

of completion on April 1, 1976, the conveyance date, but in no instance had Penn Central before April 1 formally transferred a property interest or reached any agreement on the amount of compensation to be paid.

At issue in No. 77–36 are some ninety properties that Penn Central and the other plaintiffs formerly owned or operated. In the early 1970's, while Penn Central was in reorganization, PUC exercised its statutory authority to appropriate those properties for highway projects. Most of the projects involved the construction of grade crossings over railroad properties. As in No. 77–35, the projects were at various stages of completion as of the conveyance date. Also as in No. 77–35, Penn Central and the state authorities had not, before the conveyance date, arrived at any agreement regarding the consideration to be paid for any of the properties. In October 1975 Penn Central filed a petition with its Reorganization Court for an order directing the PUC to provide the court with a list of the appropriated properties and other information pertinent to the appropriation proceedings. At a hearing in the Reorganization Court in April 1976 to consider procedures for determination and payment of the compensation owing, ConRail moved to dismiss the petition on the ground that the matter fell within the original and exclusive jurisdiction of this Court because the properties had been conveyed on April 1 to ConRail under section 303(b)(1) of the Rail Act. The parties entered into a stipulation, approved by the Reorganization Court on May 10, 1976, concerning arrangements for payment into escrow of the appropriation proceeds.

## II

We must decide who is entitled to the amounts to be paid by the states in consideration for the properties appropriated.

All the parties agree that these cases are within the jurisdiction of this Court, although they disagree as to the proper jurisdictional basis. The plaintiffs say that jurisdiction is predicated on section 209(e)(2) of the Rail Act. That section gives the Special Court original and exclusive jurisdiction of any action "to interpret, alter, amend, modify, or implement" our conveyance orders. These actions to interpret or implement the conveyance documents affecting the appropriated properties fall exactly within the statutory grant. *See Consolidated Rail Corp. v. Pittsburgh and Lake Erie Railroad Co.,* 459 F.Supp. 1013 (Sp.Ct.R.R.R.A.1978). ConRail contends that the complaints in effect seek a reconveyance to the Trustees under § 209(e)(1)(E). Although cast as a jurisdictional point, ConRail's contention in reality goes to the merits of these cases. It is therefore taken up below in our discussion of the merits.

These disputes arose because the state proceedings were not completed before the April 1 conveyance date. The Trustees' primary contention, in both cases, is that the United States Railway Association (USRA) was powerless under the Act to designate for conveyance whatever rights the plaintiffs might have had in relation to the affected properties. Most of the properties, the plaintiffs say, were occupied by highway bridges and crossings on the conveyance date. For this reason, they urge, the properties could not be considered "used or useful in rail transportation service" within the meaning of the Rail Act and could not, therefore, have been designated to ConRail. The only right that existed in relation to these properties on conveyance date, according to the plaintiffs, was the right to receive the consideration to be paid upon the execution of documents transferring title to the properties. Such a right, they argue, could not be deemed "used or useful in rail transportation service" within the meaning of the Act. USRA, the plaintiffs conclude, was therefore powerless to transfer the right to ConRail. ConRail's position, in broad outline, is that the attempted transfers were not completed before conveyance date, or were, for various reasons, ineffectual. Title to the properties, according to ConRail, therefore remained in Penn Central until the conveyance date. Because the conveyance documents failed to except

the affected properties from conveyance, the argument continues, title passed to Con-Rail as transferee. Rights to the proceeds, ConRail concludes, should vest in it, the party who conveys legal title to the states.

If title to the affected properties remained in Penn Central and the other plaintiffs until the conveyance date, we conclude that the conveyance documents were so drafted that title to the properties passed to ConRail on April 1. All the documents respecting the properties affected by the occupations or appropriations purport to convey "[a]ll of the Grantor's right, title, and interest, legal and equitable, in and to the real property". No exception is made for interests to be acquired by governmental entities under the power of eminent domain. The breadth of the pertinent documentary language and the absence of any specific exception for properties being appropriated are decisive. We note, in addition, that USRA, a nominal defendant in these cases, affirmed by letter and during the course of argument that USRA's intention was to convey full title to ConRail if, under state law, title was in the transferors' estates as of April 1.

We find no merit in the plaintiffs' contention that USRA was powerless under the Rail Act to designate these properties for conveyance. Doubtless hundreds of condemnation proceedings affecting designated properties were ongoing as of the April 1 conveyance date. It would have been extremely difficult and unduly burdensome for USRA, the agency responsible for drafting the conveyance documents, to have determined which of such properties had become no longer "used or useful in rail transportation service" and then have excepted each such property from conveyance.

We have determined that the conveyance documents by their terms conveyed title in the affected properties to ConRail, assuming that the plaintiffs retained title to the properties until conveyance date. We turn now to the question whether, as ConRail urges, the proceeds should be paid to the party who conveys or has conveyed legal title to the states. USRA also takes this position.[1] The right to the proceeds would, under this view, turn on whether title to the properties passed before the April 1 conveyance date.

ConRail contends that USRA's treatment of this matter is action of the sort that section 209(e)(1) of the Rail Act commands the Court to respect unless it is found to have been "in reckless or deliberate disregard of applicable law". According to the Conference Report, the strict standard imposed in section 209(e)(1) was intended to apply to review of "the Association's designations and any other determinations made in developing the final system plan." H.R. Rep. No. 94–781, 94th Cong. 2d Sess. 187–88 (1976). Perhaps these cases might be regarded as involving not a USRA determination of substantive policy respecting the disposition of assets useful in rail transportation service but merely a rule of thumb adopted by the Association as a convenient simplification[2] and, therefore, as outside the scope of section 209(e)(1).

We need not decide, however, whether the strict standard of review governs. We agree with ConRail that USRA's solution is a reasonable one. We are not unmindful, at this stage in the development of the law of property, that the concept of title is not a juridical elixir capable of dissolving all problems of ownership. There is, concededly, a touch of arbitrariness in deciding these

---

**1.** USRA filed an affidavit of its Assistant General Counsel, Douglas L. Siegel, which stated that after a January 8, 1976 meeting attended by representatives of ConRail and the Penn Central Trustees USRA adopted the following conveyance principle:

LAND SUBJECT TO CONDEMNATION
Land will not be retained by the Estates on the sole ground that it is the subject of a pending condemnation proceeding. If the condemnation proceeds to the point where

title passes prior to conveyance, the right to the proceeds will be retained by the Estate.

**2.** At the hearing, USRA's counsel observed that the choice of an April 1 cutoff date was "a logical choice", for it would have been impossible for USRA to have investigated every ongoing condemnation proceeding affecting properties to be conveyed pursuant to the Rail Act and the Final System Plan.

disputes on the basis of the locus of title. Nevertheless, unless there are compelling reasons of equity to the contrary, discussed below, the proceeds should go to the party who conveys or has conveyed legal title to the condemning states.

## No. 77–35

The Trustees stipulate that legal title to the properties appropriated by the states of Ohio and Indiana did not pass to those states prior to conveyance date. And they do not argue that title should have been conveyed before April 1, for it is stipulated that the states paid no consideration before that date.

■ The Trustees argue, however, that they are entitled to the proceeds because the equitable interest in the affected properties passed to the states upon the execution before the conveyance date of the agreements permitting occupation of the properties. The plaintiffs invoke the doctrine of equitable conversion. Under that doctrine, the vendee of real property under a specifically enforceable sales contract is treated for certain purposes as the equitable owner of the property and the vendor as holding bare legal title as trustee for the vendee. *See Oberholtz v. Oberholtz,* 79 Ohio App. 540, 74 N.E.2d 574 (1947); 3 A. Casner, *American Law of Property,* § 11.22 (1952 ed.). Professor Casner points out, however, that the doctrine is generally regarded as but a "convenient label" for the "consequences of the equitable right to specific performance". *Id.* at 63. As Dean Pound wrote over a half century ago, "conversion is a name given to results reached on other grounds, not a fact from which we may reason for all purposes and with respect to the rights of all parties . . . ." Pound, *Progress of the Law, 1918–1919— Equity,* 33 Harv.L.Rev. 813, 832 (1920). Assuming that under the appropriation agreements the states of Ohio and Indiana acquired rights tantamount to the right of specific performance, the conversion fiction would operate not for the benefit of the plaintiffs but for the benefit of the vendee states. The principles that underlie that doctrine of property law have no bearing on the dispute before us.

■ Legal title remained with the plaintiff transferors until April 1 and passed to ConRail on that date. ConRail is entitled to the proceeds that will be paid out when it conveys title to the affected properties to the states of Ohio and Indiana.

## No. 77–36

■ The Pennsylvania appropriations at issue in No. 77–36 differ significantly from the Ohio and Indiana appropriations. Whereas Ohio and Indiana proceeded to occupy appropriated properties under agreements with the railroads before the conveyance of any property interest, the Pennsylvania Public Utility Commission proceeds by way of appropriation orders that suffice in themselves to transfer title to the state. The PUC appropriation orders state that the properties "are hereby severally taken and appropriated".[3] Under Pennsylvania law, condemnation takes place when the PUC issues its order, notwithstanding that the order is not recorded. *Pennsylvania Public Utility Commission v. Department of Highways,* 44 Decisions of the Public Utility Commission 782, 788 (1970).

ConRail urges, however, that the PUC orders did not effectively transfer title interest to the Commonwealth of Pennsylvania because Penn Central did not seek or secure the Reorganization Court's approval of the transfers. ConRail relies on sections 77(a) and 77(j) of the Bankruptcy Act, 11 U.S.C. § 205(a), (j). Section 77(a) gives the Reorganization Court exclusive jurisdiction over the debtor and its property wherever situated. Subsection (j) implements the grant of exclusive jurisdiction by empowering the court to issue orders staying pending lawsuits against the debtor. Under its section 77(j) authority, the Reorganization Court entered an order on June 21, 1970, that provides:

> All persons . . . whatsoever and wheresoever situated, located or domi-

---

**3.** Paragraph 5 of the PUC order appended to the Stipulation filed in No. 77–36.

ciled, hereby are restrained and enjoined from interfering with, seizing, converting, appropriating, attaching, garnishing, levying upon or enforcing liens upon, or in any manner whatsoever disturbing any portion of the assets . . . interests, railroads, properties or premises belonging to or in the possession of the Debtor, as owner, lessee or otherwise . . . .

ConRail asserts that Pennsylvania's action in condemning these properties without prior Reorganization Court approval violates the court's order and is therefore void. Support for this contention is found in *In re New York, New Haven & Hartford Railroad Company,* 447 F.2d 428 (2 Cir. 1971), in which the Court of Appeals upheld a determination of the New Haven Reorganization Court voiding a New York City condemnation order against the debtor's property issued in the face of the court's order enjoining all interference with the debtor's property. The Reorganization Court's refusal to issue an order *nunc pro tunc* approving the condemnation was affirmed even though the condemnation involved only a minor spur and additional, unoccupied land and did not interfere with the railroad's use of the track. The Reorganization Court held the condemnation order void *ab initio,* but the appeals court did not reach the question whether the order was void or merely voidable, 447 F.2d 428, 430 n.4. In *Blanchette v. State of New York,* 412 F.Supp. 219, 221 (S.D.N.Y.1976), Judge Frankel held that such orders are void *ab initio.*

The view that states have no power to condemn the property of railroads in reorganization without bankruptcy court approval is not unanimous. In *Commonwealth v. Bartlett,* 384 F.2d 819 (1 Cir. 1967), *cert. denied,* 390 U.S. 1003, 88 S.Ct. 1245, 20 L.Ed.2d 103 (1968), the court held that, in some circumstances, a state's prescriptive rights to a debtor's property are paramount to federal bankruptcy interests. The court in *Bartlett* emphasized that the grant of exclusive jurisdiction to the bank-

ruptcy court in section 77(a) is qualified by the phrase "during the pendency of the proceedings under this section and for the purposes thereof". 384 F.2d at 820. When the purposes of the reorganization proceedings would not be served by giving the reorganization court an at best "temporary veto" over the exercise of the eminent domain power, the court decided, the taking does not conflict with section 77(a) and may proceed without the reorganization court's consent. We need not cast our lot with the First Circuit's view of that question to find *Bartlett* 's reasoning attractive when, as here, the argument for the exclusivity of the reorganization court's power over the debtor's property is asserted not by the estate's trustee for the benefit of creditors but by a transferee of the debtor's property to the detriment of the estate. We are loathe, to borrow the plaintiffs' characterization of the matter, to use a creditors' shield as a sword to lop off the creditors' rights to the condemnation proceeds.

ConRail raises a further argument based on section 77(c)(2) of the Bankruptcy Act, 11 U.S.C. § 205(c)(2). That provision states in relevant part:

In operating the business of the debtor with respect to safety, location of tracks, and terminal facilities, the trustee or trustees shall be subject to lawful orders of State regulatory bodies of statewide jurisdiction to the same extent as would the debtor if a petition respecting it had not been filed under subsection (a) of this section except that (A) any such order which would require the expenditure, or the incurring of an obligation for the expenditure, of money from the debtor's estate shall not become effective (a) unless the trustee or trustees, with the approval of the court, shall consent thereto

. . . .

■ The PUC appropriation orders contain a provision requiring the railroad at its own expense to maintain the facilities constructed under the orders.[4] ConRail con-

---

4. Paragraph 19 of the representative PUC order appended to the Stipulation filed in No. 77–36 requires Penn Central to

furnish all material and do all work necessary [after completion of the construction] to maintain its facilities at the new crossing,

tends that the orders are void or ineffectual because they compel the Penn Central estate to expend funds without the approval of the Reorganization Court. The short answer to this argument is that the maintenance obligation provisions of the PUC orders are separable from the provisions that transfer title to the state. Section 77(c)(2) does not void *ab initio* the entire order, nor even the maintenance provision of an order, for failure to secure the court's approval. It merely prohibits the trustees of the debtor's estate from expending funds in accordance with the order without the consent of the reorganization court and empowers the reorganization court to veto the expenditure of funds. *See, e. g., In re Penn Central Transportation Company,* 347 F.Supp. 1349 (E.D.Pa.1972). Even if the Penn Central Trustees in the past made expenditures for maintenance without securing the approval of the reorganization court, the validity of the PUC orders themselves would remain unaffected.

Finally, ConRail urges that even if legal title was transferred to the state by virtue of the PUC appropriation orders we should nevertheless award the proceeds to it for reasons of equity. ConRail says that the PUC orders impose certain burdens on the owner of the properties affected by the highway projects and argues that as the successor to those burdens it should reap the benefits incident to the appropriations as well. The PUC orders obligated the plaintiffs, and now ConRail, to insure that the construction is completed in conformity with the PUC's specifications.[5] In addition, the owner of the properties incurs the obligation to maintain the improvements in good repair in the future.[6]

Assuming that we could depart from USRA's recommendation that the right to the proceeds vest in the party who conveys or has conveyed legal title to the state, see our discussion above, we decline to do so in this case because arguments from the equities are inconclusive. It does not appear from the stipulation of facts whether or not the owner of the affected properties will be compensated for the costs of supervising the construction of the highway facilities. If such compensation is forthcoming, ConRail presumably will incur no loss. If not, then the plaintiffs will suffer as well, because many if not most of the projects were substantially completed before the conveyance date.

■ As for the maintenance obligations, the plaintiffs have argued that those involve nothing more than the obligation of the railroad to maintain its own facilities. We have not been apprised of the nature and extent of the maintenance obligations that might be incurred and so cannot evaluate the Trustees' argument. It is fatal to ConRail's argument in this regard, however, that the only issue before the Court is the right to compensation for the appropriations themselves. In Pennsylvania the issue of the costs of future maintenance and repair is separable from the issue of compensation for property rights appropriated. *Cf. Township of Scott v. Pennsylvania Public Utility Comm'n,* 188 Pa.Super. 174, 146 A.2d 617 (1958). The PUC may allocate part of the costs of maintenance to the Department of Highways, *Pennsylvania Railroad Co. v. Pennsylvania Public Utility Comm'n,* 136 Pa.Super. 1, 7 A.2d 86 (1939); to a benefited municipal corporation, *Erie R.R. v. Public Service Comm'n,* 271 Pa. 409, 114 A. 357 (1921); or entirely to the railroad itself, *see Township of Scott v. Pennsylvania Public Utility Comm'n, supra,* 146 A.2d 617, 621. If ConRail wishes to have the commonwealth or a municipal corporation share the costs of maintenance, it may petition the PUC for an order allocating the costs. Public Utility Law §§ 409, 411, 66 P.S. § 1179, 1181; *Township of Scott v. Public*

---

above grade, herein ordered constructed, including the drainage installed under its tracks.

**5.** Paragraphs 7–9 of the PUC order appended to the Stipulation filed in No. 77–36.

**6.** *See* note 4 *supra.*

*Utility Comm'n, supra,* 146 A.2d 617, 618–19.

█ We hold that the plaintiffs are entitled to the proceeds to be paid out by the state as compensation for the PUC appropriations.

\*     \*     \*     \*     \*     \*

Counsel should agree upon and submit a form of judgment order giving effect to our rulings in these actions.