NORFOLK SOUTHERN RAILWAY COMPANY and Pennsylvania Lines LLC, Petitioners

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Feb. 3, 2005.

Decided Feb. 25, 2005.

Reargument and Reconsideration Denied April 20, 2005.

W. Gregory Rhodes, Pittsburgh, for petitioner.

David A. Salapa, Asst. Counsel, Harrisburg and Stephanie G. Spaulding, Pittsburgh, for respondent.

BEFORE: PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge PELLEGRINI.

Norfolk Southern Railway Company (Norfolk Southern) appeals an order of the Pennsylvania Public Utility Commission (PUC) adopting the recommended decision of the Administrative Law Judge (ALJ) granting the application of the City of Pittsburgh (City) for approval of the alteration of three railroad crossings over the tracks operated by Norfolk Southern in Pittsburgh, Pennsylvania, with the City paying for the initial costs of those alterations and Norfolk Southern paying for the initial cost to maintain the substructures, necessary supports and superstructures of the structures in a safe and satisfactory condition.

## I.

The subjects of this proceeding are three bridges located on the North Side of Pittsburgh. They are the Ridge Avenue Bridge, the West Ohio Street Bridge and the North Avenue and Brighton Bridge. All three Bridges cross over railroad tracks located in a cut and are operated by Norfolk Southern. On November 4, 2002, the City filed an application with the PUC alleging that the Ridge Avenue and West Ohio Street Bridges, both located in Allegheny Commons Park, a City park designated as a historical site,[1] were severely dilapidated and required repair. Because it was a historical site, the City requested that the repair not alter the appearance of the Bridges or the park.

Regarding the history of the Bridges, the City's application stated that the Bridges in the park were constructed in 1903 by the Pennsylvania Railroad Company pursuant to an agreement by which it agreed to construct and maintain the Bridge abutments, necessary supports and superstructures while the City agreed to perform the paving of the roadways and footways. Regarding the North Avenue and Brighton Road Bridge, the City stated that it was built in 1905 by the Pennsylvania Railroad Company and reconstructed by the same company in 1929. The City further alleged that in 1949, the PUC ordered the Pennsylvania Railroad

---

1. The Pittsburgh Historic Review Commission (Commission) was established in 1979 and is the body that governs the appearance of buildings and districts which Pittsburgh City Council designates as historic. A 1990 City Council resolution designated the park as an historic district. The park was initially laid out after the Revolutionary War as a public square surrounded by dwellings and common land for farming—then the City of Allegheny—to provide lands for veterans of that war. The park was designed in 1876. Both the structures within the park and the landscaping are elements of the Historic District. The

Ridge Avenue Bridge and the West Ohio Street Bridge are located within the park. A City ordinance requires that the Commission approve all visible alterations to structures in City historic districts. The Commission denied an application to reconstruct the pedestrian bridge in the park whose purpose was, *inter alia,* to increase the overhead clearance of the bridge. Neither the Ridge Avenue Bridge nor the West Ohio Street Bridge is listed in the National Federal Registry of Historic Places. (Findings of Facts 19–24, ALJ's August 25, 2003 decision.)

Company to maintain the substructure of the Bridge except for the roadway paving and sidewalks. However, the Pennsylvania Railroad Company and its successors have refused and/or failed to perform the necessary maintenance or repair of the Bridge, allowing it to deteriorate.

The application continued to state that Norfolk Southern wanted to alter the Bridges by increasing their height by three and one-half feet to a total height of 23 feet, even though 52 Pa.Code § 33.121 only allows overhead clearance above railroad tracks to 22 feet. The City argued that increasing the overhead clearance would adversely alter the appearance of the park Bridges and the appearance of the park itself by altering the topography of the park and would adversely affect the park because of an increase in train traffic. As to the North Avenue and Brighton Road Bridge, which is contiguous to the historic Bridges, the City argued that it would create major distortions to the existing roadways, side streets, driveways and properties in the area surrounding the Bridge. Further, the City contended that an increase in clearance would necessitate an increase in costs for the reconstruction of the approaches to the Bridges as well as for the Bridges themselves. The City estimated that costs of rehabilitation of the Bridges was $825,000 for the Ridge Avenue Bridge; $1,100,000 for the West Ohio Street Bridge; and $100,000 for the North Avenue and Brighton Road Bridge.

In response, Norfolk Southern filed a protest to the application arguing that the City's request could not be granted because an application for an exemption from overhead clearance could only be filed by a carrier pursuant to 52 Pa.Code § 33.127(b) when the carrier deemed an exemption necessary, and Norfolk Southern had not filed such a request. Further, Norfolk Southern argued that the PUC did not have authority to grant an exemption that interfered with its operations because any regulation that interfered with its operations was pre-empted by the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10501(b), which gave the Surface Transportation Board (STB) exclusive jurisdiction over transportation by rail carriers and pre-empted federal or state law with respect to regulation of rail transportation.

Pennsylvania Lines LLC (Pennsylvania Lines), a subsidiary of Consolidated Rail Corporation (Conrail), also filed a protest arguing that the three Bridges were owned by the City, and the City was responsible for their rehabilitation. It also argued that neither it nor Norfolk Southern had any obligation to rehabilitate the Bridges under the maintenance agreements or the PUC's order referenced in the application because they were liens and encumbrances that were extinguished by operation of the Regional Rail Reorganization Act of 1973 ("3R Act"), 45 U.S.C. §§ 701–797(m).[2] As such, any claim to

---

**2.** The 3R Act was enacted by Congress "in response to the transportation crisis precipitated by the bankruptcies of major railroads in the Northeast and Midwest and charged the United States Railway Association ('USRA'), a federally chartered government corporation, with the primary responsibility to develop and implement a 'Final System Plan' ('FSP') to preserve rail services previously provided by the bankrupt railroads." After determining which routes of the bankrupt carriers could be operated profitably, the

USRA designated particular lines for transfer from the estates of the bankrupt carriers to the Consolidated Rail Corporation ('Conrail'), a government-owned corporation created for the purpose of acquiring those lines.

After the USRA completed the FSP and it was approved by Congress, the FSP was then transferred to the newly created Special Court. The Special Court was given exclusive jurisdiction over all proceedings relating to the FSP. Under the FSP, "the Special Court

challenge an action taken pursuant to the 3R Act had to be brought in the Special Court, which was created by the 3R Act, or, after it was abolished, in the United States District Court for the District of Columbia. Pennsylvania Lines argued that the Special Court had original and exclusive jurisdiction over such claims and the PUC had no jurisdiction to consider the City's application. The Pennsylvania Department of Transportation (PennDot) filed an answer to both protests.

After a hearing was held before an ALJ, the ALJ issued a recommended decision finding first that the PUC had jurisdiction over this matter. He then approved the City's application for the alteration of the three Bridges and dismissed the protests of Norfolk Southern and Pennsylvania Lines. The ALJ recommended that within 18 months from the PUC's order, the City, at its initial cost and expense, furnish all material and do all work necessary to pre-pare and submit to the PUC for approval a set of detailed construction plans for the replacement of the Ridge Avenue and West Ohio Street Bridges and plans for the repairs of the North Avenue and Brighton Road Bridge and, within two years from the PUC approval of the plans, furnish all materials and do all work necessary to complete the work ordered. The ALJ also ordered that Norfolk Southern, at its initial cost and expense, furnish all material and do all work necessary to maintain the substructures, necessary supports and superstructures of the structures in a safe and satisfactory condition. Upon completion of the work, the ALJ recommended that the PUC hold a further hearing so that costs and future maintenance responsibilities could be allocated among the parties. The ALJ did not make a determination as to which party actually owned the Bridges.[3]

issued 'conveyance orders' requiring the bankrupt carriers to transfer their lines to Conrail. The Special Court then granted special operating rights to other carriers to prevent a Conrail monopoly in any area." *In re Consolidated Rail Corporation*, 867 F.Supp. 25, 26 (D.D.C.1994). The Special Court was abolished in 1997 and its original jurisdiction was transferred to the United States District Court for the District of Columbia.

3. However, the ALJ did make the following findings of fact regarding the history of the rail lines ownership and maintenance:

1. The Pittsburgh Fort Wayne and Chicago (PFWC) owned the rail line between Pittsburgh and Chicago known as the Fort Wayne Line. Tr. 164–165.

2. The Pennsylvania Railroad Company (PRC) owned and operated the rail line between Philadelphia and Pittsburgh. Tr. 164.

3. Pursuant to an agreement between the PFWC, the City and PRC in the 1860's, PRC operated the rail line between Philadelphia and Chicago, including the rail line owned by PFWC. Tr. 164–65.

4. In the later 1960's, PRC and the New York Central Railroad merged to form Penn Central Company (Penn Central), pursuant to which Penn Central succeeded to PRC's rights to operate the Fort Wayne Line. Tr. 165.

5. Penn Central operated over the Fort Wayne Line until April 1, 1976. Tr. 166.

6. The trustees of Penn Central transferred designated properties in Allegheny County, Pennsylvania—including the Fort Wayne Line—to Conrail by deeds dated March 30, March 31, and August 16, 1976. Tr. 166–167, 170; Pa. Lines Ex. 1–3. The deeds provided that "the real property and the easements and rights hereby conveyed to [Conrail]" are conveyed "free and clear of any liens and encumbrances...." Pa. Lines Ex. 1 at 1; Pa. Lines Ex. 2 at 1; Pa. Lines Ex. 3 at 1; Tr. 166–67–; 170.

7. By a Bill of Sale effective April 1, 1976, Penn Central also conveyed to Conrail various other assets, including all agreements relating to the deeded assets. The Bill of Sale excepted from the agreements any and all construction, demolition, rehabilitation, and maintenance agreements. Tr. 167; Pa. Lines Ex. 4, Sch. E at E1–E9.

8. By deed effective June 1, 1999, Conrail conveyed its interest in the Fort Wayne Line to its subsidiary, Pennsylvania Lines,

Norfolk Southern filed exceptions to the ALJ's recommended decision arguing that the requirement that it maintain the existing 19 foot overhead clearances for the park Bridges was contrary to the PUC regulations found at 52 Pa.Code §§ 33.121–128. It also objected to the ALJ's reliance on the 1947 contract and the PUC's accompanying order as a basis for imposing interim maintenance obligations because that contract was not enforceable. Even if it was, Norfolk Southern took the position that only a Special Court in the District of Columbia could hear and decide the matter pursuant to the 3R Act. Finally, Norfolk Southern argued that the ALJ mistakenly found that the North Avenue and Brighton Road Bridge was located on the edge of the historic park instead of outside of the historic park.

The PUC granted in part and denied in part Norfolk Southern's exceptions. Regarding the first exception, the PUC noted that it had the power under 66 Pa.C.S. § 2702(b) to prescribe the manner in which rail crossings were to be reconstructed or repaired. Although Norfolk Southern argued that the Bridges had to meet the 22 foot clearance requirement, and only a railroad could seek such an exemption from the requirement, the PUC determined that the general clearance requirements did not apply and the PUC was not limited by those requirements. As to the second exception, the PUC found there was evidence that Norfolk Southern owned and continued to own the Bridges, and the Special Court in the District of Columbia did not have jurisdiction to decide the matter because that matter was decided in *Trustees of Property of Penn Central Transportation Company v. United States Railway Association*, 463 F.Supp. 1321 (D.D.C.1979), and it was held that issues of maintenance could be adjudicated by the PUC. Finally, the PUC found Norfolk Southern's third exception to be meritorious because the evidence produced indicated that the North Avenue and Brighton Road Bridge was located outside of the historic park, not on the edge of the park as the ALJ had found. The PUC then went on to accept the ALJ's recommended decision. This appeal by Norfolk Southern followed.[4]

LLC [Pennsylvania Lines]. Tr. 168–69; Pa. Lines Ex. 5.)

9. [Pennsylvania Lines] currently owns the real estate and the rails of the Fort Wayne Line. Tr. 168–70; Pa. Lines Ex. 5.

10. Pursuant to a June 1, 1999 Operating Agreement with PRR, Norfolk Southern Corporation leases and operates the Fort Wayne Line. Tr. 170.

11. NS is a wholly-owned subsidiary of Norfolk Southern Corporation. Tr. 163.

12. A 1901 ordinance agreement (the 1901 ordinance) assigned maintenance responsibilities for the bridges in the City of Allegheny between McClure Avenue and the Allegheny River Bridge along the PRC's railroad tracks. Tr. 74–75; City Ex. 16. PRC agreed to build the North Avenue bridge, the Ridge Avenue bridge and the Ohio Street Bridges and to maintain the abutments, supports and superstructures of the bridges. City Ex., 16.

13. In 1946, PRC and the City entered into an agreement for the raising of the three bridges in question to provide additional clearances. The agreement states that upon completion of the work PRC shall, at its own cost and expense, maintain the substructures, necessary supports and superstructures of the bridges, except for the roadway and footway paving thereon, which the City is to maintain. Tr. 78; City Ex. 22.

(ALJ's August 5, 2003 decision at 4–5.)

4. Our scope of review of the PUC's decision is limited to determining whether constitutional rights have been violated, whether an error of law has been committed, or whether findings and conclusions of law are supported by substantial evidence. *Vertis Group v. Pennsylvania Public Utility Commission*, 840 A.2d 390 (Pa.Cmwlth.2003), *petition for allowance of appeal denied*, —— Pa. ——, 859 A.2d 770 (2004).

## II.

### A.

■ Norfolk Southern first contends that the PUC did not have jurisdiction under the 3R Act to enforce the "old contracts" to find that it was responsible for maintenance costs of the Bridges. Norfolk Southern explains that when the U.S. District Court for the District of Columbia assumed the jurisdiction and functions of the Special Court, it assumed jurisdiction over such matters as determining responsibility for maintenance costs. It directs our attention to 45 U.S.C. § 719(e)(2) which provides:

The original and exclusive jurisdiction of the special court shall include any action, whether filed by any interested person or initiated by the special court itself, to interpret, alter, amend, modify, or implement any of the orders entered by such court pursuant to 45 U.S.C. section 743(b) of this title in order to effect the purposes of this chapter or the goals of the final system plan.

Despite Norfolk Southern's contention, the Special Court itself has held that it does not have jurisdiction over matters regarding the allocation of costs of future maintenance and repair of local railway crossings.[5] In *Trustees of the Property of Penn Central Transportation,* the Special Court addressed the issue of whether it had jurisdiction over matters pertaining to the allocation of costs relative to the repair of railroad facilities stating the following:

As for the maintenance obligations, the plaintiffs have argued that those involve nothing more than the obligation of the railroad to maintain its own facilities. We have not been apprised of the nature and extent of the maintenance obligations that might be incurred and so cannot evaluate the Trustees' argument. It is fatal to ConRail's argument in this regard, however, that the only issue before the Court is the right to compensation for the appropriations themselves. **In Pennsylvania the issue of the costs of future maintenance and repair is separable from the issue of compensation for property rights appropriated.** *Township of Scott v. Pennsylvania Public Utility Comm'n,* 188 Pa.Super. 174, 146 A.2d 617 (1958). **The PUC may allocate part of the costs of maintenance to the *Department of Highways,*** *Pennsylvania Railroad Co. v. Pennsylvania Public Utility Comm'n,* 136 Pa.Super. 1, 7 A.2d 86 (1930); **to a benefited municipal corporation,** *Erie R.R. v. Public Service Comm'n,* 271 Pa. 409, 114 A. 357 (1921); **or entirely to the railroad itself,** See *Township of Scott v. Pennsylvania Public Utility Comm'n, supra,* 188 Pa.Super. 174, 146 A.2d 617, 621. **If ConRail wishes to have the commonwealth or a municipal corporation share the costs of maintenance, it may petition the PUC for an order allocating the costs.** Public Utility Law §§ 409, 411, 66 P.S. § 1179, 1181; *Township of Scott v. Public Utility Commission, supra,* 188 Pa.Super. 174, 146 A.2d 617, 618–619. (Emphasis added.)

*Id.* at 1327–1328.

Moreover, the PUC has exclusive jurisdiction under 66 Pa.C.S. § 2702(b) to order

---

5. Norfolk Southern relies upon *Consolidated Rail Corporation, infra,* for the proposition that the 3R Act created the Special Court's exclusive jurisdiction to decide issues regarding the conveyance and transfer of assets to Conrail. Based on Norfolk Southern's own statement of its holding, that case has no relevancy to the issue at hand. What is at issue is whether the Special Court has jurisdiction over matters regarding the allocation of costs of future maintenance and repairs at local railway crossings in Pennsylvania, not the conveyance and transfer of assets to Conrail.

the construction, reconstruction, alteration, repair, protection suspension or abolition of a rail highway crossing. That section provides in relevant part:

The commission is hereby vested with exclusive power to appropriate property for any such crossing .... and to determine and prescribe, by regulation or order, the points at which, and the manner in which, such crossing may be constructed, altered, relocated, suspended or abolished, and the manner and conditions in or under which such crossings shall be maintained, operated, and protected to effectuate the prevention of accidents and the promotion of the safety of the public.

Additionally, 66 Pa.C.S. § 2704 gives the PUC the authority to determine the costs of construction and alteration of a crossing and requires that the costs be borne and paid by the municipal authority in such proper proportions as the PUC may determine after notice and a hearing. Consequently, because the PUC had jurisdiction to order what work would be performed on each of the Bridges, to allocate which parties, at their initial costs, would be responsible for the work and maintenance after the work was performed, and to order that a subsequent hearing would be held after the work was completed to further allocate costs and maintenance responsibilities, Norfolk Southern's argument is without merit.

## B.

■ Norfolk Southern also argues that the PUC did not have jurisdiction to determine whether it owned the three Bridges, but even if it did, the PUC erroneously determined that it owned the Bridges based on the "old agreements" between the City and Pennsylvania Railroad Company. Initially, we point out that the PUC does have jurisdiction to determine which

party has ownership of the Bridges in this case. In *City of Philadelphia v. Consolidated Rail Corporation,* 222 F.3d 990 (D.C.Cir.2000), the Court of Appeals specifically addressed the issue of bridge ownership. In that case, although the Special Court had determined that Conrail and Amtrak owned the real property under the 41st Street Bridge which had been conveyed to them by its previous owner, Penn Central, on appeal the Court stated:

Because this case presented a question that will likely rise again in the context of litigation over the so-called "orphan bridges" to which neither the railroads nor the municipalities claim title, and because state law governing ownership of the bridge is dispositive of the question of contractual allocation of maintenance agreements, we concluded that an authoritative response to the question would assist in establishing uniformity in future proceedings. We further concluded that the precise effect of the ordinance contracts on questions of **bridge ownership is purely a question of state law.** We therefore petitioned the Supreme Court of Pennsylvania for certification of the question of state law under 204 PA CODE § 29.451 (1999). The Pennsylvania Supreme Court helpfully granted our petition, and has now decided the certified question.

*Id.* at 993. The Court went on to describe how ownership was determined and ultimately reversed the Special Court. However, what is relevant in this case is that ownership is determined by state law, i.e., by the PUC and its rules and regulations. If there is any question arising from its ruling, appeals may be taken to this Court.

■ In any event, the PUC denies that it made any determination regarding ownership of the Bridges. The PUC acknowledges that it stated there was *evidence* on the record that Norfolk Southern owned

and continued to own the Bridges, but it argues that it was only referring to this evidence in order to distinguish a case relied upon by Norfolk Southern. The PUC directs our attention to its decision at page six of its order which states the following in response to Norfolk Southern's Exception No. 2:

In its Exception No. 2, Norfolk Southern objects to the ALJ's reliance on the 1947 contract and the accompanying Commission Order as a basis for imposing interim maintenance obligations on the Parties. Norfolk Southern contends that the maintenance agreements found in that contract are no longer enforceable. Norfolk Southern bases its assertion on the *City of Philadelphia* cases, *viz. City of Philadelphia v. Consolidated Rail Corporation,* 560 Pa. 587, 747 A.2d 352 (2000) and *City of Philadelphia v. Consolidated Rail Corporation,* 222 F.3rd 990 (D.C.Circuit Ct.2000) and also on the Regional Rail Reorganization Act (the "3R Act," 45 U.S.C. § 701 *et seq.*) (Exc. At 7–12).

On review of Exception No. 2, we find that it is not meritorious. First the factual nexus of the instant proceeding is distinguishable from the facts of the *City of Philadelphia* cases. Briefly, in those cases the Supreme Court addressed the question of ownership of a railroad bridge. No evidence had been presented to establish that the railroad owned the subject bridge, so the Court relied on the default rule that the owner of the street carried by the bridge owns the bridge. Those cases are distinguishable because in the instant case **there is record evidence that indicates that the railroad, Norfolk Southern, owned and continues to own the bridges.** (City's Main Brief at 23–33; City's Reply Brief at 4–9; City's Exhibits Nos. 13–17, 23A, 23B, 24 and 25; Equitable's Exhibit No. 3).

As to the 3R Act, it conveyed contractual obligations for bridges which a railroad actually owned and therefore, **if Norfolk Southern owned the bridges,** the contractual maintenance agreements it entered into for the bridges were also conveyed. The Special Court which hears claims under the 3R Act has specifically said: "the issue of costs of future maintenance and repair is separable from the issue of compensation for property rights appropriated." *Trustees of Property of Penn Central Transportation Company v. United States Ry. Assoc.,* 463 F.Supp. 1321, 1328 (Special Ct. 1979). In short, the Court that dealt with the 3R Act stated that issues of maintenance were separable, and could, therefore, be adjudicated by the Pennsylvania Public Utility Commission.

(PUC's July 26, 2004 decision at 6–7.) (Emphasis added.) While it appears that the PUC is stating in one paragraph that Norfolk Southern *is* the owner of the Bridges and in the next paragraph it is stating that it *may not be the owner,* in addition to these two paragraphs of its decision, we have reviewed the PUC's decision in its entirety and cannot find any other language in the decision where the PUC discusses and concludes that Norfolk Southern actually owns any or all of the three Bridges. It appears that the PUC was merely distinguishing a case, especially in light of the fact that it was only answering Norfolk Southern's exception regarding maintenance costs, and the PUC determined that the costs of maintenance *could be adjudicated separately from ownership.* Consequently, because there is no conclusion by the PUC that Norfolk Southern owns the three Bridges, Norfolk

Southern's arguments are without merit.[6]

### C.

■ Finally, Norfolk Southern contends that the park Bridges are not exempt from the 22 foot overhead clearance requirements set forth in the PUC regulations. 52 Pa.Code § 33.121(a) provides:

> Minimum overhead clearances above railroad tracks, used or proposed to be used for transporting freight cars, *shall be 22 feet,* except as provided in this Subchapter. Structures constructed, or under construction, prior to the adopting of this Subchapter may be maintained at existing clearances and additional tracks may be constructed and existing tracks reconstructed at the same clearances. (Emphasis added.)

While it acknowledges that 52 Pa.Code § 33.121(a) "grandfathers" in bridges existing at the time the regulations were adopted in 1974,[7] Norfolk Southern points out that Section 33.126 provides that whenever a railroad bridge is relocated or reconstructed, it loses its grandfathered status and must meet the 22 foot clearance requirement. Section 33.126, entitled "Lesser clearances," states:

> Except as otherwise provided in this subchapter, if overhead or side clearances between a track and any building, structure, or facility are less than the minimum prescribed in this subchapter, but were created prior to the adoption of such provisions, such minimum clear-

ances shall be provided whenever such a building, structure, or facility is relocated or reconstructed. However, the Commission may grant specific requests for the future continuance of prior clearances at such reconstructed buildings, structures, or facilities, if application is made as provided in § 33.127(b).

52 Pa.Code § 33.126. Subsection 127(b) provides:

> If, in any particular case, exemption from any of the requirements of this subchapter is deemed necessary *by the carrier concerned,* the Commission may grant an application by such carrier for such exemption if accompanied by a full statement of conditions exiting and the reason why such exemption is requested.

52 Pa.Code § 33.127(b). (Emphasis added.) Norfolk Southern then argues that the PUC ignored these regulations, and only it, as the carrier, could have requested the exemption and it did not.

The PUC, however, argues that it not only has discretion under Section 66 Pa. C.S. §§ 2702(b) and (c) to prescribe that repair work and rebuilding of the Bridges be performed, but it also has discretion under 52 Pa.Code § 33.128, entitled "Application of regulations," which allows it to decide issues involving bridges on an individual basis regardless of any limitations imposed by other regulations in the subchapter. That section provides:

---

6. In the alternative, Norfolk Southern argues that it was not provided with notice and an opportunity to be heard regarding ownership of the park Bridges at the hearing before the ALJ. More specifically, it contends that even though the ALJ stated that the issue regarding ownership would not be determined until after a second hearing was held, the PUC held that Norfolk Southern owned the park Bridges. Because we have determined otherwise, we need not address this issue.

7. 52 Pa.Code § 33.121(a) provides:

Minimum overhead clearances above railroad tracks, used or proposed to be used for transporting freight cars, shall be 22 feet, except as provided in this Subchapter. Structures constructed, or under construction, prior to the adopting of this Subchapter may be maintained at existing clearances and additional tracks may be constructed and existing tracks reconstructed at the same clearance.

(a) Wherever the words "railroads," "railroad tracks," "tracks," "buildings," "entrances to an inside of buildings," "structures," "facilities," "platforms," and other similar terms appear in this Subchapter, they apply only to property owned by, or leased to, common carrier railroads.

(b) This subchapter does not apply to repairs, renewals, maintenance, extensions, additions, or rearrangements in substantially the same location and within the general plan of existing installations if existing clearances are not reduced.

**(c) This section shall not be construed as limiting the authority or jurisdiction of the Commission.**

(Emphasis added.) We disagree.

**Subsection (c)** of 52 Pa.Code § 33.128 only pertains to Section 33.128, not to the entire **"Subchapter C"** entitled **"CLEARANCES."** This is evidenced by the fact that subsection (b) of 52 Pa.Code § 33.128 specifically uses the language **"this subchapter,"** meaning "Subchapter C," and that if the PUC had wanted to use the same language in subsection (c), it could have done so. But, it did not. Were we to accept the PUC's interpretation of Section 128, we would be allowing the PUC to ignore its own regulations, which it cannot do. *See Popowsky v. Pennsylvania Public Utility Commission,* 853 A.2d 1097 (Pa. Cmwlth.2004).[8] Because subsection (c) to 52 Pa.Code § 33.128 does not apply to the entire Subchapter C, it does not have the authority under this provision to waive the 22 foot clearance absent an application from the railroad.[9]

Just because the PUC under it own regulations is required to impose an overhead clearance of 22 feet unless the railroad seeks an exemption does not necessarily mean that the Bridges have to be reconstructed to achieve that height clearance because that goal could also be achieved by lowering the tracks. There is no dispute that the site is historical in nature in that it was created at the time of the Revolutionary War. If the Bridges are raised, that will have a severe impact on the park due to longer and higher street approaches to the Bridges and that could impact its historic nature. It is also undisputed that the park is an important recreational asset that could also be undermined by the increased height of the Bridges. One or both of those concerns seemed to have been taken into consideration by placing the railroad line in a cut so as not to visually impact the park when the line was constructed. Also, the PUC is constitutionally required to take those concerns into consideration under Article I, Section 27 of the Pennsylvania Constitution which declares the people's right to the preservation of the natural, scenic, historical and esthetic values of the environment and further provides that the public natural resources are the common property of all the people.

While the PUC took away from itself the ability to exempt reconstruction of bridges at less than 22 foot overhead clearance requirements unless the carrier sought an exemption, it must take into consideration the historic and esthetic nature of the park and the recreational activities in fashioning

---

8. *See also Tri–State Transfer v. Department of Environmental Protection,* 722 A.2d 1129 (Pa. Cmwlth.1999) (we need not give deference to an agency where its construction of a regulation is contrary to its plain meaning or where the agency ignores the language of its own regulation).

9. We note that to date, the City has not challenged the legality or constitutionality of 52 Pa.Code § 33.127(b) limiting waivers to "carriers."

a remedy. Based on the outcome of those considerations, the PUC could order that the Bridge be raised, that the tracks be lowered or a combination to preserve the park's historic and esthetic nature as well as its recreational use. Accordingly, that portion of its order is vacated and the case is remanded to the PUC for the purpose of determining how the 22 foot clearance will be achieved in accordance with this opinion.

## ORDER

AND NOW, this 25th day of February, 2005, the order of the Pennsylvania Public Utility Commission dated July 26, 2004, is vacated and the case is remanded to the PUC for the purpose of determining how the 22 foot clearance will be achieved in accordance with this opinion.

Jurisdiction relinquished.